GOVERNMENT OF THE VIRGIN ISLANDS, Appellee

v.

ALBERTO NAVARRO, JULIO COLON, JR., ISRAEL MIRANDA,
SIXTO PINERO, JR., MARCIAL SANTANA, Appellants
ALBERTO NAVARRO, Appellant in No. 74-1700 and No. 74-1988
JULIO COLON JR., Appellant in No. 74-1763 and No. 74-1898
ISRAEL MIRANDA, Appellant in No. 74-1701 and No. 74-1869
SIXTO PINERO, JR., Appellant in No. 74-1702

Nos. 74-1700, 74-1701, 74-1702, 74-1763, 74-1869,
74-1898, and 74-1988

United States Court of Appeals

Third Circuit

Argued December 5, 1974

Filed March 18, 1975

544

STANLEY M. POPLOW, ESQ. (POPLOW & ABRAMSON), Philadelphia, Pa., *for appellants*

JOHN S. WILBUR, JR., ESQ., Assistant U.S. Attorney, St. Croix, V.I., *for appellee*

Before SEITZ, *Chief Judge*, VAN DUSEN and ROSENN, *Circuit Judges*

OPINION OF THE COURT

SEITZ, *Chief Judge*

These appeals are from defendants-appellants' conviction of first degree murder and assault in the first degree after a jury trial in the District Court of the Virgin Islands and from denial of their motions for judgments of acquittal or for new trials. Defendant Julio Colon, Jr., was charged and convicted as the perpetrator of the offenses;[1] defendants Israel Miranda, Alberto Navarro and Sixto Pinero, Jr., were convicted on the basis of their having aided and abetted Colon in the commission of the crimes.[2]

Because all defendants convicted as aiders and abettors challenge the sufficiency of the evidence to sustain their conviction, it will be necessary to set forth the facts in some detail.

---

[1] Violations, respectively, of 14 V.I.C. §§ 922(a)(1) and 295 (1964). Colon was sentenced to mandatory life imprisonment on the murder count and to a consecutive six year sentence for assault.

[2] 14 V.I.C. § 11 (1964) punishes as a principal anyone who "aids, abets, counsels, commands, induces or procures" the commission of a crime. All three defendants convicted of aiding and abetting Colon were sentenced to concurrent prison terms of life imprisonment (murder count) and five years (assault).

April 1, 1974, was a holiday in the Virgin Islands, and the day's activities included a performance by a local band at Cramer Park, St. Croix. A large crowd gathered at the park, including all defendants and Leroy Ford, an off duty policeman whose brother, Joseph Ford, was a member of the performing band. In mid-afternoon, a stabbing occurred at the east end of the park. Under Patrolman Ford's supervision the injured man was placed in an automobile for transportation to a hospital. Instead of immediately leaving the park, however, the car proceeded northward towards the beach from whence shots were then heard. Patrolman Ford, accompanied by his brother, walked in the direction of the shooting to investigate.

According to the policeman's testimony, as he and his brother Joseph neared a large genip tree on their return to the bandstand, "two Puerto Ricans was coming toward my direction." These men were later identified by Patrolman Ford as defendant Colon and Marcial Santana.[3] At trial, Ford testified that when he identified himself as a policeman, Colon responded with an obscenity and came forward to scuffle with Joseph Ford. During this fight, a crowd estimated by one witness to include as many as 25 people gathered near the fight scene. Three government witnesses, however, testified to the existence of a group of five or six young men who, according to one witness, came "close together" around the struggle. Evaristo Rios, a spectator, identified defendants Miranda, Pinero and Navarro as part of this group whose members in unison yelled "kill him" in Spanish while Joseph Ford and Colon fought. With the help of Rios, Patrolman Ford broke up the fight.

As he was disengaged from the struggle, Joseph Ford warned his brother that Santana, Colon's companion, had a gun. Patrolman Ford walked toward Santana to search

[3] Although named in the information filed against these defendants, Marcial Santana was not tried with them because he could not be apprehended.

him, but was spun around from behind and distracted. One witness at trial, Rudy Williams, indicated that the policeman was pulled around by members of the group of men of "Spanish birth" who had come "close together" around the fight scene. Williams and another witness, Joseph Gumbs, testified that at this time a gun was passed "from one to the next" among members of this group.

When Patrolman Ford searched Santana he found no gun. He testified that while he looked elsewhere for the gun, defendant Colon circled around the group and shot Joseph Ford in the chest from a distance of approximately eight feet. Joseph Ford fell to the ground near the base of the genip tree behind which Patrolman Ford and Rios immediately took refuge. Both Ford and a park employee, Ben Hur Brady, testified that Colon fired a second shot, which lodged in a branch some two feet above the policeman's head.

Thereafter, the guns of both Colon and Ford misfired when the two attempted to exchange further shots. The policeman was rushed from behind by a group which Rios testified included Miranda, Navarro and Pinero and was hit in the head with a shell wielded by Pinero, according to the testimony of Brady. Although Brady did not specifically see Miranda or Navarro engage in this assault, he did, however testify that Miranda, Navarro and Pinero all kicked the body of Joseph Ford before leaving and that Pinero hit the body with a rock. Medical evidence at trial established that the body of Joseph Ford had lacerations over the right temple and a deep wound above the left eye.

Brady testified that after the attack, all four defendants left the scene in a yellow Volkswagen. The driver of the car, Jose Gonzalez, testified, however, that he drove only Miranda, Navarro and Santana from the park.

All defendants testified at trial. Their testimony revealed that the four were from the same neighborhood

and had known each other for some time. Julio Colon recalled that on April 1 he had heard two shots fired while he was at the bar in the band pavilion, but stated that he left with a stranger in a yellow Volkswagen without seeing or hearing anything else. Sixto Pinero denied having heard any shots at the park that day or seeing anyone with a gun. Alberto Navarro claimed that he heard shots but left shortly thereafter with Gonzalez, Santana and Miranda in a yellow Volkswagen. Israel Miranda admitted seeing the incident as described by other witnesses, but testified that he walked away from the scene and left with Gonzalez, Navarro and Santana.

## Sufficiency of the Evidence

Defendants Miranda, Navarro and Pinero assert on appeal that there was insufficient evidence in the record on which the jury could find beyond a reasonable doubt that they aided and abetted Colon in the offenses charged: the murder of Joseph Ford and the assault of Leroy Ford "by firing at [him] with a revolver." In examining the evidence to determine whether it is in fact sufficient to support the jury verdict of guilty, this Court must view the evidence in the light most favorable to the prosecution. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Cades, 495 F.2d 1166, 1169 (3rd Cir. 1974). Furthermore, we are bound by the jury's determination of credibility and its decision to accept the testimony of witnesses who contradicted the defendants. Government of the Virgin Islands v. Gereau, 502 F.2d 914, 921 (3rd Cir. 1974).

Viewed in this light, the testimony at trial establishes the following sequence of events with respect to these defendants:

1. They were members of a group of five to six men identified as "Puerto Ricans" or of "Spanish birth" who closed in around the fight between Joseph Ford and Colon and yelled "kill him" during the course of that struggle;

548

2. A gun was passed from Santana among some members of that group while Patrolman Ford was spun around and his attention diverted by members of the group;

3. After Joseph Ford was shot, all three defendants kicked the body and Pinero hit the body with a rock; and

4. All three defendants engaged in a physical assault on Patrolman Ford after Colon fired at him, with Pinero identified as striking the policeman in the head with a shell.

The question to be determined is whether this evidence is sufficient to support a finding that the defendants aided and abetted Colon in his attacks on the Fords.

■ In order to be convicted as a principal in the commission of a crime on the basis of aiding and abetting the perpetrator, an individual must have a "purposive attitude" to see the venture succeed and must participate in the criminal endeavor at least to the point of encouraging the perpetrator and "participate in it as something that he wishes to bring about. . . ." United States v. Peoni, 100 F.2d 401 (2d Cir. 1938) quoted in Nye & Nissen v. United States, 336 U.S. 613 (1949). In determining whether a defendant has associated himself with and participated in a criminal undertaking, care must be taken that speculation is not permitted to substitute for evidence. United States v. Barber, 429 F.2d 1394 (3rd Cir. 1970). This axiom is particularly apt in any case where a number of spectators view the events because there is the possibility that mere bystanders might have been erroneously identified as aiding the commission of the crime.

■ We are of the opinion, after careful review, that the evidence in this case substantiates the jury's finding of complicity on the part of these defendants in Colon's crimes. The jury could have found that the defendants, by yelling "kill him" when Colon grappled with Joseph Ford, encouraged and induced him to subsequently shoot Ford. The

significance of these words of encouragement is increased by the fact that they came from a group of neighborhood friends of Colon whose close proximity to the fight could itself have been viewed by the jury as an encouragement. Cf. United States v. Thomas, 469 F.2d 145 (8th Cir. 1972). Furthermore, some members of the group actively facilitated the murder by diverting Patrolman Ford while Santana's gun was passed among them to Colon.

The physical attacks on Patrolman Ford and on the body of his brother weigh heavily against the defendants. Although generally proof showing one to be an aider and abettor relates to events occurring before the charged crime of the perpetrator, evidence of acts subsequent to the commission of the crime is competent to prove a common design, and is significant in evaluating the conduct prior to the commission of the offense of one charged as an aider and abettor. United States v. Thomas, supra; People v. Kolep, 29 Ill.2d 116, 193 N.E.2d 753 (1963). At a minimum, defendants' attacks upon the Ford brothers after the shooting ceased pointedly demonstrate that the defendants approved of Colon's conduct and give rise to an inference that they shared his criminal purpose of engaging in a general assault on the Fords. Viewed against the background of this conduct, the earlier exhortation to "kill him" takes on added significance as an encouragement to Colon.

The jury had a right and an obligation to consider all the facts and circumstances respecting the defendants in determining the question of their criminal liability as aiders and abettors. Our review of that evidence convinces us that there was sufficient evidence to support the jury verdict and that the district court did not err in denying the motions of defendants Miranda, Navarro and Pinero based on insufficiency of the evidence.

*Jury Charge*

The same three defendants also urge that the trial court

erred in its charge to the jury on the elements necessary to constitute one an aider and abettor. The court instructed the jury as follows:

To aid and abet one another in the commission of a crime means to assent to an act or to lend countenance or approval to it by active participation or by encouraging it in some other manner. Mere presence at the scene of the crime or knowledge that a crime is being committed, or acquiescence, is not, in itself, sufficient to constitute a person as an aider and abettor. The assistance may consist of either overt acts or oral expressions.

Defendants contend that the instruction was deficient in that the court failed to advise the jury that the defendants could not be convicted of aiding and abetting the commission of a crime unless their acts or words had been done or spoken with the intention of effecting the crimes.

█ We note at the outset that no objection to this portion of the court's charge was made by any of the defendants' attorneys when an opportunity for objections was offered at trial. In view of this failure to comply with the mandate of Rule 30, F. R. Crim. P., that objections to the charge must be made before the jury retires, we could sustain defendants' challenge only if the charge as given constituted plain error. Rule 52(b), F. R. Crim. P.

Defendants urge that the charge is grossly deficient when assessed against the standards established in Hicks v. United States, 150 U.S. 442 (1893). In Hicks the evidence showed that the defendant had sat astride a horse beside one Colvard while Rowe, an acquaintance of the defendant, had repeatedly raised and lowered a rifle aimed at Colvard. Each time the rifle was lowered the defendant laughed, and on the last occasion pulled off his own hat and said to Colvard "pull off your hat and die like a man." Rowe then shot and killed Colvard, and the defendant was tried as an aider and abettor.

The Supreme Court found error in that portion of the charge in which the trial judge advised the jury that the defendant could be found guilty "if the facts show that he either aided or abetted or advised or encouraged" the perpetrator. This instruction was deficient because it failed to inform the jury that the acts or words which constituted aiding or abetting must have been used by the defendant with the intention of encouraging the perpetrator. The Court was concerned lest possibly innocent words be the basis of liability because they had the effect of inciting the perpetrator even though they were used for a different purpose.

■ In this case, however, the charge given by the district court contained elements of affirmative conduct not present in the Hicks charge. The definition of aiding and abetting given by the trial judge required that the defendants "assent to an act," or lend "countenance or approval to it by active participation." The inclusion of such elements in the charge largely removes the possibility that the defendants could have been found guilty regardless of the intent with which they spoke and acted.

■ Furthermore, a charge must be viewed in its factual setting in order to determine if plain error exists. Herzog v. United States, 235 F.2d 664 (9th Cir.), cert. denied, 352 U.S. 844 (1956). Such a view of the charge here also distinguishes this case from Hicks. In Hicks, the only evidence that the defendant might have aided or abetted Rowe was that he laughed, spoke the quoted words to the victim, and, under duress according to the defendant's testimony, left with Rowe. The case against Miranda, Navarro and Pinero, however, included testimony of more active participation, including words of encouragement to Colon, assistance in passing the murder weapon, and attacks on the Ford brothers after Colon ceased firing.

552

Under the circumstances of this case, we conclude that the court's charge, while not a model instruction on aiding and abetting, was not so deficient that it could have given rise to a miscarriage of justice and thus did not constitute plain error of which this court should take notice under Rule 52(b).

*Identification Procedures*

Defendants Colon and Navarro challenge the procedures through which they were confronted by witnesses who ultimately identified them at trial. Treatment of the issues raised by these procedures will require an elaboration of the facts surrounding the confrontations.

On April 1, the evening of the incident at Cramer Park, Ben Hur Brady was shown six mug shot books containing several hundred pictures. From these photographs, he identified Colon as the individual who had done the shooting and Santana as the individual accompanying Colon at the initial confrontation with the Fords.

The next day, April 2, all four defendants and Jose Gonzalez were at the police station for questioning. The defendants, all of Puerto Rican descent, were in a small room with at least three detectives, including two of Puerto Rican heritage, and were apparently standing in an unformed line near a desk. Evaristo Rios, who had been brought to the station to give a statement, walked through the room in which the defendants were waiting to a back room. Through a one-way mirror from that room he identified Colon, Navarro, Miranda and Pinero as having been involved in the incident at Cramer Park.

Patrolman Ford was then brought into the room in which the defendants were standing. Initially he pointed out Gonzalez and left the room. After entering and leaving a second time, this time with a detective and another policeman, Ford identified Colon as the individual who had shot his brother.

While he was at the station on April 2, mug shots were taken of Navarro; that afternoon twelve photos, which included pictures of all four defendants and four other individuals, were shown to Brady at Cramer Park. On that occasion, Brady identified Miranda, Navarro and Pinero as being involved in the incident and again identified Colon.[4]

Defendants Colon and Navarro contend that the "showup" procedure at the police station was so suggestive that the in-court identifications of both of them by Rios, and of Colon by Ford, should have been suppressed. Navarro also contends that Brady's photographic identification of him was achieved through impermissibly suggestive means, while Colon urges suppression of the Ford and Rios identification on the additional ground that he was not provided counsel prior to the showup. No challenge is made to Brady's photographic identifications of Colon, and defendants Miranda and Pinero do not attack the identification procedures on appeal.

While the use of a showup rather than a lineup and the presence of more than one picture of the defendants in the photographs shown Brady on April 2 may have been "suggestive" to some degree, this does not dictate that the witnesses' in-court identifications be suppressed. In Neil v. Biggers, 409 U.S. 188 (1972), the Supreme Court explicitly reaffirmed the proposition that the underlying rationale of decisions such as Simmons v. United States, 390 U.S. 377 (1968) (photographic identifications), and Stovall v. Denno, 388 U.S. 293 (1967) (one man showup), is that a defendant is denied due process when the identification procedure is so suggestive as to create "a very substantial likelihood of irreparable misidentification." The question is whether "under the 'totality of

---

[4] Because more favorable to the government, we accept for purposes of this appeal Brady's testimony that the display of photographs was made to him at Cramer Park on April 2, 1974, rather than Detective McBean's uncertain statement that the showing was made "more or less" on April 3, 1974.

the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Id. at 199. Neil identified five criteria to be weighed in determining the likelihood of misidentification: (1) the opportunity for the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

 In applying the Neil criteria to this case we find that the district court's denial of motions to suppress the in-court identifications was not error. Patrolman Ford and Evaristo Rios had an unimpeded opportunity to view the individuals involved in the incident at close range during the course of the fist fight and subsequent shootings. Ben Hur Brady viewed the physical attacks on the policeman and his brother from a distance of approximately 40 feet, but he had seen all defendants earlier in the day at the park and thus had some familiarity with their faces. All witnesses were intent on the shooting incident, with Patrolman Ford and Rios in the very center of the proceedings from beginning to end. The testimony at the suppression hearing indicates no lack of certainty on the part of Rios in identifying all four defendants at the police station or on the part of Brady in selecting Colon and Navarro from photographs shown him. Although Patrolman Ford entered the interrogation room twice before identifying Colon, he was certain in his identification when made and testified that no suggestions were made to him while he was out of the room. Finally, the length of time between the incident and the identifications was in no case more than 24 hours, thus insuring that the witnesses' memory of the incident and of those involved was fresh.

Weighing all the factors, and considering evidence cited by defendants though not discussed here, we conclude under the "totality of the circumstances" that the challenged identifications of Colon and Navarro were reliable, were not the product of unduly suggestive procedures, and that there was no substantial likelihood of misidentification of the defendants.

■ Neither do we feel that the in-court identification of Colon by Ford and Rios should be subject to the exclusionary rule of United States v. Wade, 388 U.S. 218 (1967), because counsel had not been provided Colon prior to the police station showup. After an evidentiary hearing, the district judge specifically found that Colon was not under arrest at the time of the police station confrontation and therefore was not entitled to counsel, relying on Kirby v. Illinois, 406 U.S. 682 (1972). This finding was not clearly erroneous and effectively disposes of Colon's claim. Furthermore, even if we held that the showup was conducted after Colon's freedom had been restrained, the failure to provide counsel would not taint the identifications, since the presence of counsel is not constitutionally required at a confrontation held after arrest but before the initiation of "judicial criminal proceedings." Id.; United States v. Coades, 468 F.2d 1061 (3rd Cir. 1972); United States v. Miramon, 470 F.2d 1362 (9th Cir.), cert. denied, 411 U.S. 934 (1973).

Since we have determined that admission of the in court identifications violated neither the defendants' due process rights nor their right to counsel, we conclude that the trial judge did not err in permitting the identifications to go to the jury.

*Jury Array*

■ Defendant Colon urges that we remand his case for an evidentiary hearing on the make-up of the array

from which his jury was chosen. Colon contends that the array was constitutionally suspect because its composition was only 12% Puerto Rican while 40% of the population of St. Croix is allegedly of Puerto Rican extraction.

This challenge was raised in the district court, but not, as Colon concedes, in a manner that complied with the provisions of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–69 (1970). Compliance with the procedural provisions of the Act is the exclusive means of challenging the jury on the basis of a violation of the statute. 28 U.S.C. § 1867(e); United States v. Arnett, 342 F.Supp. 1255, 1258 (D. Mass. 1970).

Defendant contends, however, that his failure to comply with the statutory procedures does not preclude a constitutional attack on the composition of the jury array. Even if such a constitutional attack was permissible in this case, a question which we do not decide,[5] the defendant is not entitled to a remand of his case because he failed at trial to take any steps to establish a prima facie case of discrimination. The jury challenge was made orally after the array had been summoned into court and was accompanied by no proffer of evidence other than counsel's unsupported statement that the array of 50 names from which defendant's jury was to be chosen did not adequately reflect the Spanish population of St. Croix. There was no request for an evidentiary hearing. Not even an allegation was made that the master jury wheel from which the array was drawn did not contain a proportionate representation of members of the Spanish community.[6]

---

[5] We need not reach, therefore, the difficult question of whether failure to comply with 28 U.S.C. § 1867(a) bars assertion of even a constitutional challenge in the same action and whether United States v. Rickus, 351 F.Supp. 1386 (E.D. Pa. 1972), aff'd mem., 480 F.2d 919 (3rd Cir. 1973), cert. denied, 414 U.S. 1006 (1973), was correctly decided. Compare Paige v. United States, 493 F.2d 22 (9th Cir.), cert. denied, 417 U.S. 935 (1974) and United States v. Greene, 489 F.2d 1145 (D.C. Cir. 1973), with United States v. De Alba-Conrado, 481 F.2d 1266 (5th Cir. 1973).

[6] Defendant has not contended that the array in this case was chosen other than in accordance with the jury selection plan of District Court of the

Indeed, for aught that defendant offered at trial, the selection of an array allegedly underrepresentative of Puerto Ricans may have resulted from pure chance in the drawing of names from a jury wheel which reflected a cross-section of the community.

 The defendant was not entitled to a jury of any particular composition so long as the selection process which produced his jury did not operate to "systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Taylor v. Louisiana, 43 U.S.L.W. 4167 (Jan. 21, 1975). The burden was on the defendant to establish a prima facie case of systematic exclusion. See Alexander v. Louisiana, 405 U.S. 625 (1972); Wright v. Smith, 474 F.2d 349 (5th Cir.), cert. denied, 414 U.S. 853 (1973). In the absence of even an offer at trial to shoulder this burden we are unwilling to remand in order to provide defendant a second opportunity to develop a record on this issue for purposes of this appeal.

The judgment of the district court will be affirmed.

---

Virgin Islands, adopted and approved pursuant to 28 U.S.C. § 1863. Under that plan a jury wheel of a minimum of 1,000 names is chosen at random from the voter register of St. Croix and from that wheel jury arrays are chosen at random as needed. 5 V.I.C. App. V, Rules 65–67 (Supp. 1973).