**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff/Appellee,**

v.

**Andy PETERS, Defendant/Appellant.**

**No. 1997/034.**

District Court, Virgin Islands,
Appellate Division,
D. St. Croix.

Nov. 10, 1998.

Maurice Cusick, Rohn & Cusick, St. Croix, U.S.V.I., for appellant.

Maureen Phelan Cormier, AAG, Department of Justice, St. Thomas, U.S.V.I., for appellee.

BEFORE: THOMAS K. MOORE, Chief Judge, District Court of the Virgin Islands; RAYMOND L. FINCH, Judge of the District Court of the Virgin Islands; and SORAYA DIASE, Territorial Court Judge, Division of St. Thomas and St. John, Sitting by Designation.

## OPINION OF THE COURT

PER CURIAM.

The issue presented is whether the evidence adduced at trial was sufficient to sustain a conviction of aiding and abetting in the commission of murder in the second degree. We conclude that it was, and will affirm the conviction.

## I. FACTS & PROCEDURAL HISTORY

Shortly after noon on January 26, 1996, sixteen year old Ajamu Williams ["Williams"] was gunned down in the Ludvig Harrigan Court ["Harrigan Court"], Frederiksted, St. Croix. He was transported to the Governor Juan Luis Hospital where he was pronounced dead on arrival. Based upon eyewitness accounts, police arrested Andy Peters a/k/a "Pankedo" ["Peters" or "appellant"] and two other individuals.[1]

An autopsy revealed that Williams had "suffered multiple gunshot wounds to his body, including a gunshot wound to the left side of his head, one to his left upper arm, one to his left upper chest, one to his left upper leg just below the knee and one to his left buttocks." (Amended Joint Appendix ["App."] at 58.) According to Dr. James Glenn's expert medical opinion, Williams death was "due to brain damage and hemorrhage caused by the gunshot wound to the left side of his head." (*Id.* at 58–59.)

The Government of the Virgin Islands ["government"] charged Peters with aiding and abetting in the commission of murder in the first degree, and unauthorized possession of a firearm during the commission of a crime of violence pursuant respectively to V.I.Code Ann. tit. 14, §§ 11, 922(a)(1), and 2253(c). In a jury trial which commenced on October 8, 1996, Peters was found not guilty of these charges and a mistrial was declared on the lesser included offense of murder in the second degree.

The government then brought charges against Peters for aiding and abetting the commission of murder in the second degree pursuant to 14 V.I.C. §§ 11, and 922(b). In a five-day trial by jury which commenced on March 10, 1997, Peters was convicted of murder in the second degree. He moved the court for judgment of acquittal on the ground that, based upon the evidence admitted at trial, no reasonable jury could have convicted him beyond a reasonable doubt. The trial court found:

> Defendant re-hashes in support of his motion the argument made to the jury: that a witness made a prior inconsistent statement; that no .380 expended shell casing was found at the scene; and that the government failed to introduce the results of a gun powder residue test. As the jury did, the court finds the argument unconvincing. There was substantial evidence from which the jury could find defendant guilty of second degree murder beyond a reasonable doubt and the verdict is not contrary to the weight of the evidence.

(App. at 92.) Having denied the motion for judgment of acquittal, the trial judge sentenced Peters to twenty-five years incarceration. This timely appeal of that conviction followed.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

■ This Court has appellate jurisdiction to review judgments and orders of the Territorial Court in all criminal cases in which the defendant has been convicted, other than a plea of guilty. 4 V.I.C. § 33.[2]

---

**1.** The other persons arrested in connection with the incident were Rodney Greenidge ["Greenidge"] and Kevin Simmons ["Simmons"]. Greenidge was tried separately and his conviction was affirmed in *Government of the Virgin Islands v. Greenidge*, Crim. No.1996–045 (D.V.I.App.Div. June 30, 1998).

**2.** *See also* Revised Organic Act § 23A, 48 U.S.C. § 1613a. The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541–1645 (1994), *reprinted in* V.I.Code Ann., Historical Documents, Organic Acts, and U.S. Constitution at 73–177 (1995 & Supp.

■■ A review of the sufficiency of the record to support the conviction is plenary. *See Walters v. Government of the Virgin Islands,* 172 F.R.D. 165, 167, 36 V.I. 101, 103 (D.V.I.1997); *Charleswell v. Government of the Virgin Islands,* 167 F.R.D. 674, 678 (D.V.I.1996), *rev'd on other grounds,* 115 F.3d 171 (3d Cir.1997). In reviewing the sufficiency of the evidence, this Court must draw all reasonable inferences in favor of the government, and be mindful not to substitute its own judgment of the evidence for that of the jury. *Sanchez v. Government of the Virgin Islands,* 34 V.I. 105, 107, 921 F.Supp. 297, 299 (D.V.I.1996); *Government of the Virgin Islands v. DuBois,* 25 V.I. 316, 319 (D.V.I.App.Div.1990).

### B. Sufficiency of the Evidence

Peters contends that no reasonable jury could have found him guilty of second degree murder beyond a reasonable doubt based upon the evidence presented at trial. Appellant specifically argues that the government's witnesses, Nefertiti O'Bryan ["O'Bryan"] and Rosalie Simon ["Simon"], completely changed their testimony at the second trial, and further contends that Sergeant Gregory Bennerson had no explanation for why no .380 bullet casings were found at the scene, which, appellant contends, supports the theory that only two weapons were used in the incident.

The government asserts that Peters was seen shooting at the victim, and even assuming arguendo that he did not have a gun, the evidence was sufficient to show that he aided and abetted the other two principals in their plan to kill Williams. The government argues that a common purpose could be found from the evidence that appellant accompanied the other individuals to the place of attack, made no attempt to stop it, fled the scene with them, and failed to report the crime to police.

■■ Murder "is the unlawful killing of a human being with malice aforethought." 14 V.I.C. § 921. A willful, deliberate, and premeditated killing is first degree murder, as is a murder committed in the perpetration of certain felonies. *Id.* § 922(a). All other kinds of murder are murder in the second degree. *Id.* § 922(b). The Virgin Islands Code also provides in pertinent part that:

(a) Whoever commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another person would be a crime or offense, is punishable as a principal.

(c) Persons within this section shall be prosecuted and tried as principals, and no fact need be alleged in the information against them other than is required in the information against the principal.

*Id.* § 11. To be convicted as a principal for aiding and abetting in the commission of a crime, the government must prove two elements: (1) that the substantive crime was committed, and (2) that the defendant knew of the crime and attempted to facilitate it. Aiding and abetting requires that:

an individual have a "purposive attitude" to see the venture succeed and must participate in the criminal endeavor at least to the point of encouraging the perpetrator and "participate in it as something that he wishes to bring about...." In determining whether a defendant has associated himself with and participated in a criminal undertaking, care must be taken that speculation is not permitted to substitute for evidence.

*Government of the Virgin Islands v. Navarro,* 11 V.I. 542, 549, 513 F.2d 11, 14–15 (3d Cir.1975) (citations omitted), *cert. denied,* 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 698 (1975). Liability as an aider

1998) (preceding V.I.Code Ann. tit. 1) ["Revised Organic Act"].

and abettor may arise from affirmative participation such as words or actions which encouraged, induced or helped the perpetration of the criminal enterprise.

## 1. Witness Testimony

██ Appellant argues that O'Bryan and Simon changed their testimony so significantly that he was denied a fair trial. Peters tries to avoid O'Bryan's testimony in both trials that he was one of the three men who approached Williams on the sidewalk. Although the three men were not personal friends of O'Bryan, she knew exactly who they were, and because she thought it strange that they were in Harrigan Court, she alerted Williams to their presence. Williams saw the three men and started to run, but was struck by bullets as his assailants immediately began shooting. O'Bryan testified that she never actually saw who did the shooting because she covered her head for protection. As the assailants were talking and retreating, Williams called out to O'Bryan to find out where the men were. O'Bryan told Williams to be quiet because they were still within earshot, but Simmons had already heard Williams' call. O'Bryan saw Simmons return to shoot Williams again.

The inconsistency Peters points out is between O'Bryan's testimony at the first trial that she saw two individuals enter the bush after the shooting, and her statement during the second trial that she saw "Rodney and then Pankedo and then Kevin" enter the bush.[3] (App. at 9.) This testimony was before the jury, together with counsel's cross-examination and impeachment of O'Bryan.

Furthermore, although O'Bryan did not see which of the three individuals was shooting at Williams, another witness, Edwin Joseph ["Joseph"], testified that he ran to his porch when he heard the shots and saw Peters and Simmons. Like O'Bryan, Joseph did not know Peters personally, but had seen him before, and knew who he was. While Joseph testified that he did not see a gun, he did see Peters' arms extended out while shots were being fired. Joseph clearly saw Peters while the shots were being fired, and also saw both Peters and Simmons run towards the shortcut after the shooting ended.

Another witness, Simon, was watching TV when she heard shots and ran to her porch to see what was happening. From her porch, she saw "the dark dude" fire shots and then run towards the bush. (App. at 36.) On cross-examination the following discourse took place between Peters' counsel and the witness:

Q   You can't say that Andy Peters, my client, was the dark individual.

A   Because I don't know him, and I don't see his face.

Q   Okay. Now, a few moments ago did you tell me or did you testify that the dark skin dude also had a gun in his hand?

A   Yes, I saw a black thing in his hand look like a gun.

Q   Okay. Now, do you recall previously testifying it looked like a jacket?

A   If I said—see I can't remember that, which I know I didn't say that.

Q   Okay. I am going to show you—I want to show you a copy of your testimony from the first judicial proceeding

      .      .      .      .      .

A   Well, the way he was running and the clothes on him, I can't see whether it was a jacket or a shirt.

      .      .      .      .      .

Q   One more thing: So at some point in time the clear skin dude and the

---

**3.** Appellant also tries to attach significance to the fact that in the second trial O'Bryan said the assailants walked into the bush, but in the first trial she testified that they ran into the bush. (Amended Br. of Appellant Andy Peters at 8–9.) Regardless of whether they ran or walked, the testimony clearly indicates that the assailants entered the bush after they retreated from their attack on Williams.

dark dude run into the bushes; right?

A   The dark skin dude was running but the clear skin dude was walking behind him.

.     .     .     .     .

A   ... But the clear skin one, I saw him around here and he walk back around here and he stood and he fired more shots (indicating).

(App. at 38–40.)   Once again, counsel for appellant exposed any discrepancies in testimony which he felt would be helpful to the jury in weighing the credibility of this witness.

■■■   Sufficient evidence "is that quantum of evidence that is adequate and sufficient to permit reasonable persons to find the appellant guilty beyond a reasonable doubt." *Sanchez*, 34 V.I. at 107, 921 F.Supp. at 299.   Appellant was seen walking with Greenidge and Simmons toward Williams; he was seen with his arms extended outward during the shooting; and he was seen fleeing the area with two other individuals after the shooting ended. Any discrepancies in the testimony of these witnesses could easily have been attributed by the jury to the different vantage points from which they viewed the incident.   *See, e.g., id.* at 107, 921 F.Supp. at 299 (holding that "[a]lthough the testimony from eyewitnesses was not entirely consistent, adequate and sufficient evidence was presented from which the jury could find guilt beyond a reasonable doubt").   In any event, this Court is bound by the jury's determination of witness credibility, even where the testimony may be contradictory.   *Accord Navarro*, 11 V.I. at 549, 513 F.2d at 14 (holding that an appellate court must accept the jury's determination of credibility and its decision to accept the testimony of witnesses who contradicted the defendants).   Insofar as these eyewitness accounts are concerned, we find that there was sufficient evidence upon which the jury could find appellant guilty of murder in the second degree beyond a reasonable doubt.

## 2.  Expert Testimony

■■   Sergeant   Gregory   Bennerson ["Bennerson"] testified as an expert in the area of ballistic and firearm examination, and was permitted to express his opinion during his testimony.   Bennerson maintains that although no weapons were recovered from the crime scene, three guns were used—a .380, a .9mm and a .45 caliber weapon.   Appellant contends that Bennerson's inability to explain why no .380 casings were found at the scene creates a reasonable doubt that a .380 caliber weapon was used.   We agree with the government that the lack of .380 casings at the scene was not a "fatal flaw in the evidence, but merely a matter to be argued to the jury."   (*See* Brief of Appellee at 6.)

Even if only a .9mm and a .45 were used, the jurors heard Joseph testify that he saw Peters with his arms outstretched toward Williams while shots were being fired, and then saw Peters and Simmons heading toward the bush.   The number of guns is unimportant given this evidence from which the jury could reasonably conclude beyond a reasonable doubt that appellant approved of the conduct of the other two individuals, and participated as an aider and abettor in their criminal enterprise of murdering Williams.   Appellant did not have to possess a gun for the jury to convict him as a principal for aiding and abetting in the commission of murder in the second degree.   *Accord, e.g., Navarro*, 11 V.I. at 542, 513 F.2d at 11.

## CONCLUSION

For the above-stated reasons, appellant's conviction will be affirmed.

## ORDER OF THE COURT

**AND NOW** this 10th day of November, 1998, having considered the arguments and submissions of the parties, and for the reasons set forth in the Court's accompanying Opinion of even date, it is hereby

**ORDERED AND ADJUDGED** that appellant's conviction is **AFFIRMED**. It is further

**ORDERED AND ADJUDGED** that, pursuant to V.I.R.App. 32, the Clerk shall issue the mandate to the Clerk of the Territorial Court twenty-one days after entry of this order and then shall administratively close this file.