UNITED STATES of America ex rel.
Ronald M. BURTON

v.

Julius T. CUYLER, Supt., S.C.I.G.

Civ. A. No. 76–3973.

United States District Court,
E. D. Pennsylvania.

Oct. 25, 1977.

Louis E. Bricklin, Philadelphia, Pa., for relator.

John G. Siegle, Asst. Dist. Atty., Media, Pa., for respondent.

## OPINION

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a habeas corpus case. Relator, Ronald M. Burton, is a state prisoner who is now serving multiple concurrent sentences, one for ten to twenty years, following conviction by a jury in March 1971 in Delaware County, Pennsylvania, on charges of robbery, burglary, and other offenses. Relator's petition is bottomed upon two alleged sixth amendment violations. First, relator complains of the admission at his trial of testimony about out-of-court lineup and photographic identifications at which petitioner was not represented by counsel. Second, relator alleges that his trial counsel rendered ineffective assistance in failing to subpoena as a witness at petitioner's pretrial suppression hearing the attorney whom the Commonwealth had contended represented relator at the lineup because the attorney's testimony, which would have demonstrated that he was unrepresented at the lineup, was crucial to a proper decision on his motion to suppress the out-of-court

identifications.[1] Before discussing the substance of relator's claims, and several underlying issues which appear to be unresolved in this Circuit, we must briefly describe the factual background.

On the evening of September 29, 1970, in Crum Lynn, Pennsylvania, two unmasked black males entered a grocery store owned and operated by Samuel Greenberg. One of the intruders stood guard near the store's entrance while the other proceeded to the rear of the store near the cash register and held Mr. Greenberg at gun point while removing about $250 from the cash register and from Mr. Greenberg's person. During the robbery the perpetrators were observed for varying periods of time (estimated at from three to fifteen minutes) by Mr. Greenberg and three young men, about fourteen years of age, who were customers at the store.[2] After the robbers had fled, the Ridley Township Police Department was notified. The police obtained descriptions of the men and distributed these to other police departments including the Chester Pennsylvania Police Department.

The Chester police responded by sending pictures of relator and one Michael Gray, along with seven other photographs, to the Ridley Township police. Both these men were being held on other charges in Chester. On October 5, 1970, Mr. Greenberg positively identified the photographs of both relator and Gray from among the group of photographs. Two days later two of the remaining three eye witnesses did the same, while one of the witnesses did not make a positive identification. Shortly thereafter, on October 8, a warrant for the arrest of relator was issued by District Justice Joseph Dougherty, the judicial officer entrusted with the task of considering warrant requests. The warrant was not thereupon served. In fact it was not until October 27, 1970, that a detainer in connection with the robbery was lodged against relator who was then in custody at the Delaware County Prison.

In the meantime, on October 13, 1970, a lineup was held by the Chester Police with respect to several then recent crimes in Chester. The lineup included relator and Gray as a result of the unrelated charges against them. However, the Ridley Township police, who were in contact with the Chester police and knew of the lineup, arranged to bring to that lineup the witnesses to the Greenberg robbery. This arrangement was plainly for the purpose of giving the four witnesses an opportunity to identify relator and Gray.

The lineup was composed of thirteen black males, all of roughly similar characteristics, and included suspects in other crimes who remained present until all the identification opportunities for all of the cases took place. At the lineup Gray was represented by Arthur Earley, Esquire, who was retained by Gray in connection with the other charges against him and who was

---

1. Our jurisdiction in this matter is based on 28 U.S.C. § 2241 (1970). The issues which we have summarized above are before us after their presentation to the full State Court system at least once. The claim that the lineup identification should have been suppressed because relator was not represented by counsel has been before the State Courts first at a pretrial suppression hearing and on direct appeal and subsequently in the pursuance of a state post-conviction remedy. The ineffective assistance claim was presented to the post-conviction hearing court by way of an amendment to relator's claims. After Judge Reed, who presided at the post-conviction hearing, dismissed relator's lack of counsel claim finding that relator was represented at his lineup, he commented that there was no evidence to support the ineffective assistance claim and that it had not been argued. The fact that Judge Reed

found that relator was represented, however, eliminated the very basis for that ineffective assistance claim. Because the evidence of ineffective assistance is so closely related to petitioner's claim that the lineup should have been suppressed, we do not regard Judge Reed's comment on the lack of evidence to reflect a view that the ineffective assistance claim was not before him. We therefore conclude that both claims are properly before us now. See Picard v. Connor, 404 U.S. 270, 278, 92 S.Ct. 509, 50 L.Ed.2d 438 (1967).

2. It appears from the record in State Court that there were others in the store during the robbery, but these persons were not witnesses at any subsequent proceeding presumably because they had no adequate opportunity to observe the robbers.

not aware of the charges stemming from the Greenberg robbery. In the course of the lineup identification, Mr. Greenberg and two of the other witnesses positively identified relator. One witness could not. The Commonwealth contends that Earley also represented relator at the lineup as the result of his acceding to the requests of relator's mother to "look after his interests." Relator asserts that Earley did not represent him.

The State trial court, in a pre-trial suppression hearing, had found that Earley represented relator at the lineup. In an opinion considering relator's post-trial motion, the Court reaffirmed that finding. In that opinion the Court quoted relator's trial counsel as stating at the hearing that he had spoken to Earley and that Earley reported that he did *not* represent relator, but then the Court seemingly relied in part upon counsel's failure to call Earley as a witness in deciding the representation issue adversely to petitioner. This state of affairs led ultimately to relator's second claim, that his trial counsel was ineffective because he did not call Earley as a suppression witness to establish that relator was unrepresented at the lineup.

The circumstances just noted raised in our mind a serious question about the completeness of the State Court record and the adequacy of its fact-finding as it related to relator's federal constitutional rights. More specifically, we felt that the State Court record was incomplete and deserved amplification on the question whether Earley represented relator at the October 13 lineup, and that it was unclear and required supplementation in order to develop some of the circumstances relating to the status of the robbery charges against him at the time of the lineup. Our inquiry into the status of the charges against relator at the time·of the lineup was necessitated by the importance of the question *when* the right to counsel attached under *Kirby v. Illinois,*

406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (*see infra*), a question the state court did not have to reach in view of its representation finding. We therefore held an evidentiary hearing. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Mr. Earley was the first witness at the hearing before us. Based upon his testimony we concluded, *see* Discussion *infra,* that relator was unrepresented by counsel at the lineup. That conclusion would have required us to invoke the exclusionary rule of *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 11 L.Ed.2d 1178 (1967) unless, under the principles of *Kirby v. Illinois, supra,* relator was not entitled to counsel because adversary judicial criminal proceedings had not begun. The Commonwealth contends that, notwithstanding the issuance of the arrest warrant, adversary proceedings had not been initiated.

■ The application of *Kirby* to circumstances in which an arrest warrant has been issued for a suspect who is in custody but who has not been indicted or arraigned or had a preliminary hearing on the charges recited in the warrant is heretofore unresolved in this Circuit. As will appear from our discussion, although the question is a close one, we believe that under the circumstances of this case relator was entitled to counsel at the lineup, and that the lineup evidence should therefore have been excluded at trial. This conclusion might ordinarily require the granting of habeas relief; however, as will also appear, we believe that the admission of such evidence was harmless error. We also find that relator was not deprived of the effective assistance of counsel. Accordingly, relief will be denied. In the discussion of relator's legal contentions which now follows, we include the findings of fact necessary for the disposition of his claims.[3]

---

**3.** Relator's claim that he was entitled to counsel at the photographic showing which preceded the lineup need not detain us. Whether or not the issuance of an arrest warrant in Penn-

sylvania initiates the prosecution, there is no right to counsel at a photographic identification because such a procedure does not constitute a critical stage in the prosecution. *United States*

II. *Discussion*

A. *Was Relator Represented by Counsel at the Lineup?*

Based upon the uncontradicted testimony of Mr. Earley that he did *not* undertake to represent relator at the October 13 lineup, we find that relator was without counsel at that lineup. Our finding is unaffected by the facts that in general terms the lineup appeared to be a fair (unsuggestive) one, and that nothing is known to have been said by the police officers to any of the victims or witnesses as they viewed the lineup which could be construed as suggestive;[4] it is also unaffected by the fact that Mr. Earley's presence may well have contributed to a prophylactic atmosphere. We do not agree with, nor have we been cited precedent for, the proposition that Mr. Earley's presence on behalf of Gray in connection with an unrelated charge constructively satisfied the asserted requirement that relator be represented. Although the *Wade* Court left open the question "whether the presence of *substitute* counsel might not suffice where notification and presence of the suspect's own counsel would result in prejudicial delay," 388 U.S. at 237, 87 S.Ct. at 1938 (emphasis supplied),[5] that issue is not fairly raised in the present context where the police knew that relator was in custody more than a week before the lineup (and that he would remain so), had already obtained a warrant for his arrest, and had obtained three positive photographic identifications from the four existing witnesses almost a full week before the lineup.[6] No prejudicial delay would have resulted in the police investigation by advising relator of the impending lineup so that he could engage counsel.[7]

Furthermore, although Mr. Earley's presence doubtless helped to assure a fair composition to the lineup, he was not even aware of any charges relating to the Greenberg robbery. He therefore would not be attuned to any communication between the police and the witnesses to the Greenberg robbery (one of whom was a victim, *see Wade, supra,* 388 U.S. at 230, 87 S.Ct. 1926). Moreover, he could not focus on the lineup as it related specifically to the Greenberg robbery[8] and therefore would have been hard pressed to evaluate "recognition by

v. *Ash,* 413 U.S. 300, 314–321, 93 S.Ct. 2568, 2576–2579, 37 L.Ed.2d 619 (1973).

We note, too, that relator does not now argue that the photographic display, which contained nine (9) head shot photographs, *see Commonwealth v. Burton,* Opinion, Crim. Nos. 412–416 (Court of Common Pleas, Delaware County, Apr. 14, 1972), was impermissibly suggestive. Indeed, the state court found to the contrary.

4. Relator's counsel conceded these facts.

5. Cf. *Marshall v. United States,* 141 U.S.App. D.C. 1, 4, 436 F.2d 155, 158 n.9, 160 n.18 (1970); *United States v. Johnson,* 147 U.S.App. D.C. 31, 34–35, 452 F.2d 1363, 1366–67 (1971).

6. As recited in our preliminary statement, the Ridley Township police received a photograph of Burton from the Chester police, who were holding him. Mr. Greenberg identified Burton's photograph on October 5, 1970, and two other witnesses made positive identifications on October 7, 1970. *See Commonwealth v. Burton,* Opinion, Crim. Nos. 412–416, at p. 1 (Court of Common Pleas, Delaware County, Apr. 14, 1972). A warrant for Burton's arrest was formally issued by a judicial officer on October 8, N.T. at 5, and Officer Joseph Dougherty arranged to bring the witnesses to the October 13 lineup at Chester in order to obtain

possible identification of Burton. N.T. at 13. These facts constitute our findings.

7. Indeed, relator testified that he resisted being placed in the lineup because he had no lawyer. N.T. at 28.

8. At the 1974 post-conviction hearing, Earley testified that he was concentrating on the relation of the lineup proceedings to Gray, his only client, though he did make some observations with respect to relator. N.T. at 9. The following colloquy is instructive:

Q. You were not paying the total attention that you might have paid had you been representing Mr. Burton.

A. That's right. I would have ignored everything else and just paid attention to Mr. Burton.

Q. But you definitely did not represent Mr. Ronald Burton.

A. No, not specifically at the time. [N.T. at 10]

Earley has also stated that, by his recollection, one or two witnesses identified relator, not three. This testimony may also suggest that he was not representing, and therefore not paying close attention to, the interests of relator. N.T. at 18.

viewers, and . . . manifestation by the viewers of the identification or lack of identification." *United States v. Daniels*, 506 F.2d 791, 795 (3d Cir. 1974) (Adams, J., concurring), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1957, 44 L.Ed.2d 454 (1975). *See Wade, supra*, 388 U.S. at 228–35, 87 S.Ct. 1933–36.

We thus conclude that if *Wade* and *Gilbert* are otherwise applicable to this case Mr. Earley's presence did not amount to sufficient compliance with its mandate.

### B. *The Right to Counsel at the Lineup Identification—An Application of Kirby*

With the decisions in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 11 L.Ed.2d 1178 (1967), the Supreme Court sought to provide some assurance that a defendant in a criminal case would not be convicted as a result of a critical out-of-court identification procedure which was or might have been unnecessarily suggestive of his guilt. The corrective measure which the Supreme Court applied was to require, under the Sixth Amendment's guarantee of the right to counsel, that a defendant placed in a lineup be given the opportunity to have representation by counsel. By this means the Court introduced into identification procedures an observer who could: (1) take steps to make certain that a lineup was not suggestive; or (2) at least note the ways in which a lineup was likely to lead to misidentification, for purposes of later suppression motions or for cross-examination of witnesses testifying to positive in-court or out-of-court identifications. To enforce its requirement, the Court announced a *per se* exclusionary rule for evidence of out-of-court identifications at which counsel was not present and not intelligently waived. *Gilbert*, 388 U.S. at 272–273, 87 S.Ct. 1951. The question whether in-court identifications were then admissible would depend on whether the government could show by clear and convincing evidence that the in-

court identification arose from an independent source and therefore was not tainted by the prior illegality. *Wade*, 388 U.S. at 240, 87 S.Ct. 1951.

In 1972, however, the Supreme Court sought to define explicitly the stage at which the right to counsel arose and thus the stage at which the *Wade-Gilbert* exclusionary rule was triggered. In *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Court announced that the right to counsel, which was the basis for the exclusionary rule, arose only "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." 406 U.S. at 689, 92 S.Ct. at 1882.[9]

The question of exactly when a prosecution has been initiated was not put to rest by the *Kirby* pronouncement. In determining when adversary judicial proceedings are in fact begun the decisions have reached varying results depending not only on the facts of the given case, but also upon the law of the jurisdiction in which the facts arose. The question is a difficult one in the general context involved here, where the person asserting a *Wade-Gilbert* claim is under arrest or is somehow restrained of his liberty but has not been indicted or arraigned or had a preliminary hearing. More specifically, it is not always clear whether or when the issuance of an arrest warrant (based upon a neutral judicial finding of probable cause) or the event of an actual arrest, with or without a warrant, constitutes the initiation of adversary criminal judicial proceedings.

The Third Circuit has considered this area of the law on two occasions, but neither case is dispositive here. In *United States v. Coades*, 468 F.2d 1061 (3d Cir. 1972), the Court held that two defendants who had been arrested for a bank robbery and were in custody but had not yet had preliminary hearings were not entitled under *Kirby* to counsel at their (several) lineups. And in *Government of the Virgin Islands v. Navar-*

---

**9.** Mr. Justice Stewart wrote for a plurality; but on this point the Chief Justice concurred. 406 U.S. at 691, 92 S.Ct. at 1883. Mr. Justice Powell concurred in the result.

ro, 513 F.2d 11, 18 (3d Cir.), *cert. denied,* 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 698 (1975), after upholding a District Court finding that a suspect who was subjected to a "showup" in a police station was not under arrest, the Court added by way of dictum that even if the showup had followed an arrest the failure to provide counsel would not have tainted the identification. The Court stated that "the presence of counsel is not constitutionally required at a confrontation held after arrest but before the initiation of 'judicial criminal proceedings.'" 513 F.2d at 18.

■ However, neither *Coades* nor *Navarro* required the Third Circuit to adjudicate or consider the question of the right to lineup counsel after the issuance of a formal arrest warrant, as opposed to a warrantless arrest. Moreover, where we are dealing with the importance of the issuance of a state arrest warrant for *Kirby* purposes, we must still consider the impact of state law on the point. In this case the state law is expressed in *Commonwealth v. Richman,* 458 Pa. 169, 320 A.2d 351 (1976).[10] We will also consider in this regard two Second Circuit cases in which the effect of the issuance of an arrest warrant is discussed.

We turn first to the case of *United States ex rel. Robinson v. Zelker,* 468 F.2d 159 (2d Cir. 1972), *cert. denied,* 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed.2d 401 (1973), on which the Pennsylvania Supreme Court relied in *Richman.* In that case, a police officer was on the scene of an armed robbery and shooting and gave chase to the escaping felons, first by car and then on foot through mid-town Manhattan. He apprehended two occupants of the get-away car, but lost the foot race to the third. Based in part on the officer's description, a judge "directed that

a complaint issue charging appellant (Robinson) with the crimes of robbery in the first degree, assault in the first degree and possession of a weapon as a felony." *Id.* at 162. Thereafter Robinson was apprehended and identified by the eyewitness police officer at an uncounseled showup.

In holding that the arrest warrant initiated the prosecution for *Kirby* purposes,[11] the Court relied in part upon the applicable provision (§ 144) of the New York Code of Criminal Procedure, which by its own terms (apparently with the statute of limitations in mind) stated: "A prosecution is commenced . . . when an information is laid before a magistrate charging the commission of a crime and a warrant of arrest is issued by him. . . ." *Id.* at 160 n.2. In the same footnote the Court noted that the issuance of an arrest warrant was the equivalent of the filing of an indictment under § 144. The Court concluded:

> Here the arrest warrant itself commanded that appellant be brought forthwith before the Criminal Court "to answer the said charge, and to be dealt with according to law." These were formal criminal proceedings, for the warrant had been signed by a judge based on an "information upon oath" that appellant did commit the crimes of assault, robbery and possession of a dangerous weapon. This being true, *Wade* required counsel at the show-up . . . . Time was not of the essence, a lineup could have been arranged and there appeared to be no "substantial countervailing policy considerations" against requiring the presence of counsel as suggested in *Wade.* [*Id.* at 163 (citation omitted).]

As we have noted, *Robinson* provided part of the basis for the discussion by the

---

10. We recognize, *see* discussion *infra,* that Pennsylvania's determination in *Richman* aids petitioner in his argument that an arrest warrant initiates a prosecution. However, we note that the applicability *vel non* of *Wade-Gilbert* under the *Kirby* decision is a matter of federal constitutional law. The present case is before us upon the assertion of federal constitutional violations. Therefore, in focusing on the purposes of the *Kirby* limitation, what is most

important is what the state *does* and the operative effects of its actions and not what the state *says* about when a prosecution begins. There may be a difference, and in such an instance the federal habeas court must apply *Kirby* consistently with its own purposes without expansion or contraction.

11. Judge Hayes dissented vigorously.

Supreme Court of Pennsylvania in *Richman, supra,* which held that under the law of Pennsylvania the issuance of an arrest warrant commands the same result and in initiating the prosecution for *Kirby* purposes (hence triggering the *Wade-Gilbert* exclusionary rule) as the law of New York. The Court stated:

> the approval by a magistrate of a written complaint is at least as significant as the indictment in determining the commencement of adversary proceedings and the strength of the governments commitment to prosecute [citing *Robinson*]. . . .
> In Pennsylvania, magisterial approval of a complaint occurs either at the issuance of an arrest warrant, or, for warrantless arrests, at the preliminary arraignment. [*Richman,* 458 Pa. at 172, 320 A.2d at 353.]

The federal constitutional underpinnings of *Robinson* have been questioned, if by inference. *United States v. Duvall,* 537 F.2d 15 (2d Cir. 1976) (Friendly, J.), dealt with a situation in which Federal agents had obtained and executed an arrest warrant. Duvall contended that, because a complaint under Rule 3, Fed.R.Crim.P., had been filed before his arrest his criminal prosecution had begun and any interrogation without the presence of counsel violated his Sixth Amendment rights under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The Court, while apparently not disturbing the *Robinson* holding with reference to New York law, stated:

> We see no reason in principle why the filing of a complaint should be deemed to give rise to a right to counsel immediately upon arrest pursuant to warrant. . . Furthermore to hold that the accrual of the right to counsel is accelerated by use of the warrant procedure would tend to discourage this whereas the policy should be to encourage it. *Id.* at 22.

■ Notwithstanding *Duvall,* we are of the view that for *Kirby* purposes the prosecution of relator was initiated prior to the

October 13 lineup. Our conclusion follows from two factors. The first is the issuance of a warrant of arrest, with the attendant (Pennsylvania law) gloss under *Richman.* Second, consistent with the focus of *Kirby* on the initiation of a prosecution, we take into account the other circumstances prior to the lineup which suggest that the true reason for holding the lineup was to enhance the prosecution's evidence, and that no investigative purpose would have been impeded by insuring that relator had an opportunity to have counsel present. As Officer Joseph Dougherty,[12] the Ridley Township police officer in charge of the case, testified at our hearing (and as we so find),[12a] he brought the robbery witnesses to the lineup specifically because he knew well in advance that relator would be in it. Moreover, the lineup followed not only the arrest warrant, but also three positive photographic identifications (out of an array of nine photographs not here assailed as suggestive, *see* n.3, *supra*) by three witnesses who had more than ample opportunity to view the robber who had held Mr. Greenberg at gunpoint. We thus find that by the time of the October 13 lineup, the Commonwealth had "committed itself to prosecute, and . . . the adverse positions of government and defendant [had] solidified." *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882.

■ Given the facts of this case, we need not decide whether the issuance of a warrant for arrest is sufficient in itself as a matter of federal law to trigger relator's right to counsel. We do not believe, however, that by simply delaying the occurrence of an arraignment or preliminary hearing (as was done in this case, presumably because relator was in custody on another charge) the state can in effect suspend the right to counsel until it has neatly tied its case together and obtained, unmonitored, the desired lineup identifications. The lineup procedure in this case was no less critical as a "preparatory step in the gathering of the prosecution's evidence,"

---

**12.** The officer was unrelated to the magistrate, Joseph Dougherty, who issued the warrant.

**12a.** *See* note 6 *supra.*

**1182**

*Wade*, 388 U.S. at 227, 87 S.Ct. at 1932, than if an arraignment and preliminary hearing had been held.

 It follows, therefore, that it was error to have admitted testimony of the out-of-court lineup identification into evidence at relator's trial.[13] Whether this error was, however, harmless beyond a reasonable doubt remains to be examined.[14]

### C. Was the Admission of the Lineup Identification Evidence Harmless Error?

 Relator argues that the evidence of positive lineup identifications by three witnesses at trial must have been prejudicial. We do not agree, however, that testimony of lineup identifications will always be prejudicial. *See Gilbert v. California*, 388 U.S. 263, 274, 87 S.Ct. 1951, 1957, 11 L.Ed.2d 1178 (1967). We must consider the question of harmless error under the standards of *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), giving due consideration to evidence against petitioner. In so doing, we must keep in mind that "testimony of . . . lineup identification will enhance the impact of . . . in-court identification on the jury and seriously ag-

gravate whatever derogation exists of the accused's right to a fair trial." *Gilbert*, 388 U.S. at 273–74, 87 S.Ct. at 1957. Where almost all of the evidence against a defendant consists of identification testimony, as here, a decision, beyond a reasonable doubt, that improper reference to out-of-court identifications did not contribute to the conviction cannot be made lightly. *See United States v. Johnson*, 147 U.S.App.D.C. 31, 33, 452 F.2d 1363, 1365 (1971) (dictum). However, where the identification testimony is otherwise unequivocal, a conclusion that a defendant was prejudiced cannot follow as a simple matter of course, much less of law. *See Butler v. Robbins*, 434 F.2d 1009, 1010–11 (1st Cir. 1970). Since we have found no precedent which provides specific guidance for the circumstances of this case, we must proceed to a particularized evaluation of the proof against relator at trial.[15]

The evidence against relator consisted almost exclusively of the testimony of four eyewitnesses: Mr. Greenberg, the store owner and victim, and the three fourteen-year-old young men, Michael Timothy Davis, Glen Boylan, and Kevin Howe. The single piece of non-identification evidence was the testimony of Michael Davis that relator threatened him at a magistrate's hearing. We will examine the testimony of

---

**13.** Counsel for relator conceded at our habeas hearing that the in-court identifications were untainted by the lineup identification. We believe that this is so by clear and convincing evidence where the unmasked robber was observed without obstruction for many minutes, not seconds, where the trial in this matter took place less than seven months after the events in question, where three positive photographic identifications were made shortly after the robbery, and where there were no identifications of others inconsistent with the in-court identifications of relator. In short, the Commonwealth easily passes the test of *United States v. Higgins*, 458 F.2d 461 (3d Cir. 1972).

**14.** The Commonwealth's asserted reliance on *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), as a bar to habeas relief appears inapposite here especially because the *Wade-Gilbert* per se exclusionary rule is not primarily based on any theory of deterrence of illegal police lineups, whereas the basis for *Stone* is that the fourth amendment exclusionary rule, having been born out of the need to deter police from illegal searches, provides no

significant measure of deterrence when enforced at the habeas corpus stage after full and fair hearing in State Court. The *Wade-Gilbert* rule arises out of the perceived need to have counsel present at a critical stage in the prosecution of a defendant for the sake of that defendant's defense at trial and therefore implicates the fact finding process. And, of course, *Stone* does not address anything but Fourth Amendment claims.

**15.** It apparently is not the law in this Circuit that where an in-court identification stems clearly and convincingly from a source independent of an illegal lineup, the evidence of the (illegal) lineup identification is automatically cured. Judge Aldisert's opinion in *United States v. Daniels*, 506 F.2d 791 (3d Cir. 1974), conceivably implies that there is such a "cure;" however, two judges of the three judge panel disagreed with any suggestion to that effect, basing their analysis directly upon *Wade* and *Gilbert*. *Id.* at 795 (Adams, J. concurring).

each of the witnesses in some detail, beginning with the victim.

Mr. Greenberg, who was behind the cash register at the time of the robbery, testified on direct examination that he was within a few feet of the unmasked robber, and that he viewed his assailant clearly for five to ten minutes, even though during part of the robbery Mr. Greenberg was made to crouch on the floor. Mr. Greenberg also told the jury that shortly after the robbery he selected relator's photograph from among ten photographs and that he later identified relator in the Chester lineup. Mr. Greenberg gave a brief description of the lineup procedures, as follows:

Q. Now sir, how many men, to the best of your recollection, were in this lineup?

A. About fourteen or fifteen.

Q. And will you tell the court and jury just what occurred when you went to the Chester police station, to this lineup?

A. Well, they gave us a sheet of paper and told us not to discuss it with anyone else.

[objection and discussion] . . ..

Q. Now this sheet of paper, or form that was given to you there, can you give us some idea of just what it was, what it looked like and what it had on it?

A. It had little blocks with numbers on it corresponding with the numbers of the men in the lineup, and we were to select the men that we thought.

Q. Did you select the defendant?

A. Yes, I did. [N.T. 23–24]

. . . . .

Mr. Greenberg's specific account of the lineup may have enhanced the probative impact of his positive lineup identification in a way which is impermissible under *Wade* and *Gilbert*.

Having testified to that identification, Mr. Greenberg then finished his direct testimony with his answer to the question whether he had any doubt that defendant relator was the robber:

I am positive. We have an integrated neighborhood and I know everybody there, and when a stranger comes in I know him immediately, and I make it my business to check to notice his face, if nothing else, I would remember his face. [N.T. 25]

On cross-examination Greenberg revealed that he could not recall giving a description to the police of the robber's facial appearance but that he had stated the robber wore "a goatee and an orange colored hat, or reddish, at an angle." N.T. 28. He also revealed that at some previous identification procedure involving suspects in Springfield, he "immediately told [the police] it wasn't the ones."

In analyzing the substance of Greenberg's testimony we think it is fair to say that Greenberg at no time wavered in his non-lineup identifications of relator. His testimony that he observed the robber clearly for five to ten minutes, his reference to selecting relator's picture out of an array of ten photographs, his positive in-court identification of relator which he related to his practice of focusing closely on the faces of strangers in his store, and his allusion to having previously excluded suspects in Springfield upon viewing them, are highly incriminatory indicia of relator's guilt from which only one conclusion seems likely, even though Greenberg had not given the police a facial description which could be tested at trial. However, the lack of a description to police after the robbery which might be tested to corroborate his in-court identification and the emphasis upon the lineup procedure dissuades us from resting a harmless error decision on his testimony alone.

We turn now to the testimony of the three other witnesses, two of whom made positive identifications at the lineup and two of whom (not the same two) made positive photographic identifications. Each of these witnesses identified relator at the trial.

Michael Davis entered the Greenberg store with his friend Glen Boylan while the robbery was in progress. Unknowingly, the

boys pushed their way into the store past the man who was standing guard. The boys went up to the counter where Mr. Greenberg and his assailant were standing. Then they saw that a gun was being pointed at Mr. Greenberg. For a time, while the gunman pilfered the cash register, the boys remained at the counter. The robber at one point aimed his gun at them; the other assailant soon came from his post at the door and told the boys to "browse" through the store, at which time the young men walked away from the counter.

Michael Davis positively identified relator in court and then testified that he had selected relator's picture from among nine a few days after the robbery. Michael then described briefly, much as did Mr. Greenberg, the lineup procedure, concluding with the statement that he had selected relator. In response to the Court's inquiry whether he had any doubt that relator was the robber Michael responded that he did not. The following colloquy ensued:

Court: What may I ask—upon what do you base such statement, Michael?

Witness: I was scared and all I could think about for about a month or two afterwards was his face; I could still remember.

Court: You mean from the time you saw him in the store?

Witness: Yes, sir. [N.T. 36–37]

Michael Davis also appeared at a pretrial magistrate's hearing and identified relator there, at which time according to his testimony relator made a threatening remark:

Q. Did the defendant threaten you? [objection] . . ..

A. Yes, as I was walking up the steps, the first man, Michael Gray had already walked past me, and then he was in front of the guy that was behind him by almost a full flight of steps.

Q. I can't hear you, Michael.

A. He was in front of the guy that was behind him by almost a whole flight of steps, and me and my two friends were standing there on the steps together and he said, I am going to get you. [N.T. 37–38]

Putting to one side for a moment the reference to the threat, Michael Davis' testimony is quite forceful, revealing not a hint of doubt in any of his non-lineup identifications of relator—the photo identification, the identification at the magistrate's hearing and the in-court identification.[16] Though a precise reference to the duration of his observation of relator does not appear in his testimony, his description of the events of the robbery reveals that it was plainly not a fleeting glimpse but occurred over a matter of at least several minutes. When the reference to relator's threatening language is included in a consideration of his testimony it is by any standard we could use to evaluate it powerfully adverse to relator, even excluding all consideration of the lineup identification.

■ The testimony of Glen Boylan, Michael Davis' companion in Greenberg's store, differs from that of the other witnesses to the extent that Boylan did not identify relator at the lineup. Having observed the robber for "a couple of minutes" while he was standing with Michael Davis in front of the store counter,[17] Glen was able to select relator's photograph from among the spread of nine or ten photographs and so testified. He also described at length the lineup procedure. Although Glen did *not* make a positive lineup identification, his testimony was so descriptive of the apparent fairness of the lineup [18] that it demands quotation:

We went into the Chester Police Department and we went upstairs into a big

---

**16.** Notably this witness did give a description to the police which he restated on cross-examination. N.T. 42–43.

**17.** N.T. 48.

**18.** The *Wade-Gilbert* rule, as we have noted, does not consider the fairness of a lineup to be a defense to *per se* exclusion of lineup testimony where a defendant's right to counsel was not honored. This case tests the acceptability of that rule because all indications are that the lineup was abundantly fair.

office—well, we went into an office. There was a lot of people standing in there and we were talking to Mr. Davis about what we were supposed to do with these papers we were given, where we were supposed to put our names and things, and then we went up to the window individually and we looked in this little window and we were to pick who we thought—well, who we seen was the man who committed the robbery. Anyway, we had squares on the piece of paper and we had to count—when we found someone—the right person, we counted how many he was, what number he was and then we put a check down on the right block after we got into another office. I identified the first man [Michael Gray] but there was a couple other people that looked a lot like the defendant, so I didn't—I wasn't really sure which one it was. Mr. Dougherty kept telling us that if we weren't absolutely sure, not to put down anything. [N.T. 50–51]

However, young Boylan positively identified relator at trial.[19] Boylan then went on to confirm in part the statement of his friend Michael Davis that relator had said something to Davis at the magistrate's hearing which included the phrase "get you." N.T. 51.

The final witness for the prosecution was Kevin Howe, the first of the three fourteen-year old witnesses to have entered the Greenberg store while the robbery was in progress. When Kevin entered, Mr. Greenberg was already crouched on the floor and being held at gun point. He viewed the gunman while standing "right across the counter from him." [20] Kevin stood near the counter for about three minutes before Michael Davis and Glen Boylan arrived. He remained at the counter with them until they all were sent to "browse" in the store. It is Kevin who estimated that the assailants were in the store about ten to fifteen minutes while he was there.[21]

Kevin made an in-court identification. He stated that the seven photos he was shown did not contain a picture of the relator, and he therefore did not select relator, though he testified that he selected Michael Gray's photo. As with the questioning of the other witnesses, the prosecuting attorney then delved into the positive lineup identification which Kevin made. On cross-examination he revealed that he, like Mr. Greenberg, had not been asked for, nor did he provide, the police with a description. Just as with the other eyewitness, Kevin's in-court identification testimony would be damaging to relator without any reference to the lineup identification for he had a long clear look at the gunman.

We cannot however just brush aside the effect of the lineup identification, with respect to Mr. Greenberg, Michael Davis, or Kevin Howe. We must be realistic in evaluating the evidence if we are to perform properly the perplexing task of assessing whether an error was harmless beyond a reasonable doubt. Telling the jury that the defendant was selected from among thirteen men shortly after a crime was witnessed may carry with it a stronger probative impact than merely selecting the man sitting next to the lawyer at the defendant's table in the courtroom. Apart from the reference to his lineup identification, Kevin Howe's testimony would be limited to that in-court identification.

■ We have sought in the preceding detailed analysis of relator's state trial transcript to ascertain as best we are able by retrospection the precise part which the three illegal out-of-court identifications played in relator's conviction. As we do so we are not unmindful of relator's contention that there are some minor flaws in the fabric of the prosecution's case, i. e. (1)

**19.** On cross examination this ensued:

Court: Why do you identify him? What makes you sure he is the man?
Witness: It is the man that was in the store.
Court: How do you know that?

Witness: Well, it might be his twin brother—no, he looks a lot like the man that was in the store, identical.

**20.** N.T. 56.

**21.** *Id.*

three of the witnesses gave the police no description which might at trial tend to corroborate, hence test their in-court identification;[22] (2) one of the witnesses failed to make any lineup identification; and (3) the case against relator was based almost wholly upon identification testimony, for the prosecution was unable to obtain and put into evidence the proceeds of the robbery, or the gun asserted to have been used, or any of the items of clothing which the testimony indicated the robber had worn, or any fingerprint or other objective evidence. Our ultimate conclusion however is that under *Chapman* standards the lineup identifications testified to at trial were in fact harmless beyond a reasonable doubt. We rely, for our conclusion, on the following factors.

The trial was held less than seven months after the robbery. Three of the in-court identifications were unequivocally positive (and one was almost that strong); moreover, the opportunity for observation of the unmasked robber by the witnesses at the scene of the crime was unobstructed and lasted over relatively lengthy periods of many minutes (perhaps as much as ten to fifteen). Indeed, one rarely sees a stronger identification case. Although the lineup identifications constituted strong evidence, we believe that in the context of the presentation of proof via these four positive in-court identifications and three references to previous identifications from a group of nine photographs, the testimony of the three inadmissible lineup identifications though strong, was cumulative rather than operative.

We emphasize that virtually none of the permissible identifications was impeached. The absence of an early description by some of the witnesses who testified to the lineup identification does not reasonably detract from the uniform certitude of their in-court identifications. Consider, for example,

Greenberg's testimony of his customary close study of the faces of strangers in the store and his statement that he immediately excluded suspects in an earlier Springfield viewing. Consider, too, Michael Davis' testimony of the face which was frighteningly impressed upon his mind for months. We also observe that the positive photographic and in-court identification by Glen Boylan (who did not make a lineup identification) stands wholly outside the realm of inadmissible evidence; we need not, therefore, attempt to carve any piece from it in considering its incriminatory impact on the jury. Additionally, there was the damning evidence of relator's threat to a witness.

While we acknowledge that the non-lineup evidence against relator does not make his conviction a mathematical certainty and that the obvious impact of the lineup testimony was adverse to him, to the extent we are able to perform the task required of us by *Harrington* and *Chapman* we have no reasonable doubt that even without the lineup testimony Burton would have been convicted and that the testimony of the lineup identifications, therefore, was not functionally contributive to that conviction.

### D. *The Ineffective Assistance of Counsel Claim*

In considering relator's claim that his trial counsel was ineffective for failing to call Arthur Earley, Esquire, to testify at his suppression hearing, we must first set forth the standard by which counsel's competency must be measured. We will then determine whether in the circumstances of this case petitioner has demonstrated the claimed violation of his Sixth Amendment rights.

In *Moore v. United States*, 432 F.2d 730, 737 (3d Cir. 1970), the Court described the requisite standard of effectiveness in terms of "normal competency,"[23] and in *United States ex rel. Green v. Rundle*, 434 F.2d

---

**22.** Apparently, however, these witnesses were not formally asked descriptions.

**23.** *Moore* involved a claim by a defendant that a public defender was appointed as his counsel too near the time of trial to provide effective assistance. The court, however, redefined the

analysis to focus on the attorney's performance at trial. After finding that counsel may not have been adequate in terms of investigation and preparation of the case, the Court remanded for a hearing.

1112 (3d Cir. 1970), the Court applied that standard to find that the failure of counsel to subpoena crucial evidence supportive of an alibi defense amounted to ineffective assistance. Relator analogizes the present situation to *Green*, asserting that the failure to call Earley to explain that he did not represent relator at his lineup resulted in the state court's erroneous finding that relator was there represented and correspondingly resulted in the erroneous admission of lineup identifications. Relator asserts that this failure was wholly unjustified by any tactical purpose.

The matter of trial tactics was ably addressed in *Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974), where the Court observed:

> Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial. [Citation omitted.] If, however, action that appears erroneous from hindsight was taken for reasons that would appear sound to a competent criminal attorney, the assistance of counsel has not been constitutionally defective. *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). [*Id.* at 696.]

We are further guided by the observation in *Moore, supra*, at 737, that

> since what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case.

We have already decided, based upon Mr. Earley's testimony, that he did not represent relator at the lineup. Were Earley to have been called as a witness at the suppression hearing we must of course presume that his testimony would have been the same. Relator therefore argues that Judge Reed would have suppressed the evidence of lineup identifications. Relator's evidence before us on ineffective assistance consisted of Earley's testimony and the appearance in the suppression hearing record of the fact that relator's trial counsel knew what Earley's testimony would be (he so commented to Judge Reed thus placing that matter on the record). Based upon these two elements of proof, relator would have us declare that his trial counsel, who was not a witness at our hearing, without any possible tactical motive caused him unnecessarily to lose his suppression motion.

The Commonwealth's position at the hearing in this matter was that relator had failed to make a case for ineffective assistance in the absence of the testimony of trial counsel as to the possible reasons for his actions. In its brief, submitted after the record of the hearing had been closed, the Commonwealth controverted any claim that trial counsel's manner of proceeding was without a tactical basis, properly reminding us that in exercising our judicial hindsight we must consider all of the pertinent circumstances. The Commonwealth argues that by telling the suppression hearing Judge in open court that he had spoken with Mr. Earley and that Mr. Earley said he did not represent petitioner, trial counsel put before the court the substance of Earley's testimony on the representation point for whatever effect it may have had, without taking the risk of calling Earley to the witness stand. The reason that calling Earley to the stand would have been damaging to the relator, the Commonwealth contends, is that Earley would have then been in a position to explain how totally unsuggestive the lineup appeared to him,[24] thus severely damaging relator's chances to also have in-court identifications excluded as tainted.

This is a forceful argument. Counsel might have thought that he could still win the representation issue even without Ear-

---

24. Earley testified at the hearing before us that insofar as he observed there were no suggestive incidents.

ley's testimony (or that he might lose it even with Earley's testimony because of Earley's mere prophylactic presence at the lineup), and/or he might have thought he had a chance to win on the question of suggestiveness or taint if he did not call Earley. Obviously, the argument goes, if counsel had no basis for such hopes, he would have called Earley to make his strongest possible case for lack of counsel at the lineup. But in the absence of such certainty, the stakes may at the time have appeared different to competent counsel than to relator now in exercising 20/20 hindsight.

The transcript of the April 21 and 22, 1970, suppression hearing before Judge Reed in state court reveals that trial counsel brought to the court's attention the fact that Earley did not represent relator in the following way:

> Your Honor, at this point I would ask you to permit me, as a member of this Bar, to permit me to say that I talked to Mr. Earley, he is now an Assistant District Attorney, but he was there [at the lineup] representing Mr. Michael Gray, and I think the record would show that Mr. Gray is his client before he became Assistant District Attorney.
>
> Court: *All right.* [S.H. at 82 (emphasis added).]

After the close of the evidence at that hearing, Judge Reed ruled against relator on all his suppression claims. Trial counsel, placing part of his legal argument on the record stated:

> Counsel: I would say that the initial description was vague enough that in my opinion, on behalf of the defense, it must have been reinforced by the pictures and the lineup and of course, I respectfully disagree with Your Honor in feeling that the lineup was proper in that the makeup was proper. You have ruled that it was a properly made up lineup, and I, of course, respectfully disagree.
>
> Court: Are you finished?
>
> Counsel: I also would respectfully disagree where Your Honor has felt that another lawyer there would take up—

Court: I didn't put great weight on that, *don't be misled. That was a passing comment and I am not stating that as law, just a passing comment, make weight for whatever it is worth to help to enlighten you from our point of view.* [S.T. at 87–88 (emphasis supplied)]

We thus believe that it is clear from the record that relator's trial counsel could reasonably have believed that he was permitted to have his comment relating to Earley's representation considered by the court. And, notwithstanding Judge Reed's post-trial opinion of April 14, 1972, (*see* p. 4 *supra*), he had at the hearing instructed trial counsel, as best we can ascertain, not to be misled into believing that the presence of Earley was determinative.

 In this factual circumstance we cannot find that relator's trial counsel acted unreasonably in failing to call Earley. The question of suggestiveness was a live issue in the State suppression hearing. Inasmuch as Earley testified at the hearing before us that he was aware of no incident which would indicate suggestiveness of any kind, there may have been reasonable justification for not wishing to call him as a witness, given the (reasonable) assumption that trial counsel was as knowledgeable about that aspect of what Earley's testimony would be as he was knowledgeable that Earley did not represent relator at the lineup. But what is most persuasive to us is that trial counsel could reasonably have believed that he did not risk the loss of very much in order to avoid calling Earley, in light of Judge Reed's ostensible receptiveness to his comment. Indeed, by our reading of the transcript trial counsel would not, even after Judge Reed announced his decision to deny suppression, have been put on notice that the failure to call Earley might have been crucial. Had the converse been true, he might have sought leave to reopen the record to call Earley at that time.

Because we are unable to conclude, based upon the record of the state court suppres-

sion hearing and the testimony of Arthur Earley standing alone, that trial counsel's action in choosing to state the testimony of Earley rather than call him as a witness was, even by hindsight, an unreasonable tactic which would not have appeared sound to a competent criminal attorney (*Beasley, supra*), or which could not be described as normally competent, we find that petitioner has not met his burden of proving the ineffective assistance claim.[25]

 Even if relator had proved his ineffective assistance claim, relief would be denied because the ineffective assistance was harmless error. There are suggestions in *Cooper v. Fitzharris*, 551 F.2d 1162 (9th Cir. 1977), and *Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974), that harmless error tests do not apply in regard to the deprivation of effective assistance of counsel. We believe, however, that where a single mistake of counsel amounting to ineffective assistance results in the admission of identifiable evidence which is otherwise susceptible to harmless error analysis that analysis can be employed in determining whether the ineffective assistance was harmless beyond a reasonable doubt.[26]

 We reach this conclusion which neither *Cooper* nor *Beasley*, given their facts, inveigh against, for essentially two reasons. First, assuming relator had shown that the failure to call Earley amounted to ineffective assistance, were we unable to apply the harmless error doctrine to that breach we would be compelled to order habeas relief even though we have determined the admission of lineup identifications, the *only* effect alleged to have stemmed from the asserted ineffective assistance, was harmless beyond a reasonable doubt.[27] We fail to see the rationale for such an inconsistency. Second, the Third Circuit Court of Appeals has held recently in *United States v. Crowley*, 529 F.2d 1066 (3d Cir. 1976), *cert. denied*, 425 U.S. 995, 76 S.Ct. 2209, 48 L.Ed.2d 820 (1977), that automatic reversal is not required for every deprivation of the right to counsel. In that case, lack of representation at a guilty plea was, under the circumstances, held harmless beyond a reasonable doubt. The court cited *United States ex rel. Green v. Rundle, supra*, in saying that "in certain circumstances ineffective assistance of counsel can be nonprejudicial, requiring affirmance of a district court judgment in spite of such ineffective assistance." *Crowley*, 529 F.2d at 1070. We think that in the circumstances of the case before us, in which the only asserted prejudice arising from the claimed ineffective assistance is the admission of lineup identification testimony, which is in turn subject to harmless error analysis, *Crowley* instructs that the application of the doctrine of harmless error is appropriate. *Cf. McQueen v. Swenson*, 498 F.2d 207, 219–20 (8th Cir. 1974).[28]

**25.** *United States ex rel. Johnson v. Johnson*, 531 F.2d 169, 174 (3d Cir.), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976) (burden on petitioner to show ineffective assistance).

**26.** We note in this regard that the harmless error question appears to be separate from the question whether the petitioner has shown sufficient prejudice arising from a mistake of counsel for a finding of ineffective assistance to be made. As the court stated in *United States ex rel. Rundle v. Green, supra* at 1115:

When a habeas corpus petitioner alleges as a ground for relief the failure of counsel to exercise normal competence in presenting specific trial evidence it is reasonable, we think, to put on petitioner the burden of showing that the missing evidence would be *helpful.* [Emphasis supplied.]

Assuming we had found an incompetent act by trial counsel, relator would have met the limited burden of showing that the absent evidence would have been helpful to him, *see Moore v. United States, supra* at 737, although that is not entirely clear in this case in view of Judge Reed's cognizance, through colloquy, that Earley did not represent relator at the lineup.

**27.** At this juncture, we incorporate our findings with respect to the harmlessness beyond a reasonable doubt of the introduction of the lineup identification evidence into our decision on relator's ineffective assistance claim.

**28.** We need not here discuss the acceptable limits of the application of the harmless error doctrine to cases where ineffective assistance of counsel appears. Certainly, we do not intend to imply that every such ineffective assistance claim is subject to a *Chapman* evaluation.

Obviously, deprivations of the right to counsel which are systemic should not be subjected to any harmless error review. Indeed, as the court in *Green, supra* at 1115, stated, "ineffective assistance of counsel may have had so pervasive an effect on the process of guilt determination that it is impossible to determine accurately the presence or absence of prejudice." But this does not mean that each and every error of trial counsel stands as a constitutional bar to conviction; rather, it means that at some point the complained-of conduct (or lack of it) may be in itself so potentially harmful given the framework of the trial system that an examination of harmlessness in the *Harrington* and *Chapman* sense would be unlikely to provide a useful or efficient mechanism for protecting the fundamental right to counsel.[29]

We therefore conclude that relator has not met his burden in proving that his trial counsel's failure to call Arthur Earley as a witness at his suppression hearing was not a reasonably competent decision supported by tactical considerations. However, even if relator had met that burden, the single mistake of counsel would still fail to justify habeas corpus relief because, beyond a reasonable doubt, it did not constitute a material and operative prejudice to relator's defense.

29. We perceive a difference between the case in which the right to counsel is claimed to have been infringed by a single mistake of trial counsel with calculable effects, subject in other contexts to harmless error analysis, and cases in which the impact of counsel's ineffective assistance is more pervasive. An example of the latter type of case, helpful for purposes of analysis, is a case in which the claimed infraction arose because a criminal defendant was denied the right to confer with counsel overnight prior to cross-examination. *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *see Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (defense counsel denied opportunity to make summation). To attempt to evaluate whether the ordered sequestration in *Geders* in fact caused harm to a defendant's case would be dangerous and unnecessary in the simple sense that the potential harm is incalculable and the mere possibility of harm arising from such an impingement is inconsistent with the Court's high assessment of the right to counsel. This high and salutary level of caution is not, however, justified when a single error of trial counsel results in admission of evidence which has already been found to be harmless beyond a reasonable doubt. *Cf. Cooper, supra* (Duniway, J., concurring).