803 F.2d 720
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
DAVID JACKMAN, Petitioner-Appellant
v.
JOHN D. REES, Warden; LUTHER LUCKETT CORRECTIONAL COMPLEX,
LaGrange, Kentucky; and DAVID L. ARMSTRONG,
Attorney General Commonwealth of
Kentucky, Respondents-Appellees.
 No. 85-5523.
 United States Court of Appeals, Sixth Circuit.
 Sept. 9, 1986.
 
 BEFORE: MARTIN and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.
 GUY, Circuit Judge.
 
 
 1
 Petitioner Jackman appeals from the denial by the district court of his petition for habeas corpus. Jackman claims that his 1979 Kentucky Circuit Court convictions for robbery, intimidating a witness, and persistent felony offender were flawed in that the trial court failed: (1) to sever counts; (2) to grant a directed verdict on the second degree robbery charge; (3) to grant a directed verdict on the intimidating a witness charge; (4) to suppress identification testimony stemming from an alleged improper pre-arraignment lineup; and (5) to require proof of defendant's age at the time of his previous felony offenses as a predicate to the persistent felony offender conviction.
 
 
 2
 We agree with the district court that these claims are without merit and affirm.[1]
 
 I.
 
 3
 On Friday, June 22, 1979, Jackman and two companions robbed the Jones Pharmacy in Lexington, Kentucky. Jackman, armed with a gun, demanded money as well as various drugs from a locked compartment. One of the other robbers wielding a knife made one of the pharmacy employees empty the cash register. It is estimated that the robbers were actually in the pharmacy from 45 minutes to an hour.
 
 
 4
 On the following Friday, June 29, 1979, Jackman took an $800 ring at knifepoint from Jack Richmond who had given Jackman a ride in his car.
 
 
 5
 On July 6, 1979, the third consecutive Friday night in this criminal escapade, Jackman and a companion returned to the Jones Pharmacy to obtain drugs. Upon entering the store Jackman was immediately recognized by one of the pharmacy employees as the person who two weeks earlier had robbed the store at gunpoint. The employee cooperated fully with Jackman's demands for drugs, cash, and the contents of a Timex watch case. During the course of this robbery, Jackman also made references to the earlier robbery. An additional employee who was present at the time of the first robbery also cooperated with the robbers' demands. Prior to departure Jackman warned the store employees that if anyone identified him they would get hurt. When Jackman and his companion had first entered the store, they had been observed by another employee of the pharmacy who was leaving. This employee, becoming suspicious, followed their car and reported the events to the police who arrested Jackman that evening. In connection with the arrest, significant physical evidence was obtained tying Jackman to the robberies. Jackman was also identified in a physical lineup by employees of the pharmacy and from a photo spread by Jack Richmond, from whom he had taken the ring.
 
 
 6
 Jackman denied participation in either of the pharmacy robberies and presented an alibi defense for both dates. He admitted that he took the ring from Richmond and pawned it for $100, but claimed that the ring was voluntarily given to him as security for an $85 debt that grew out of solicited sexual favors bestowed by Jackman upon richmond.
 
 
 7
 At the conclusion of the trial the jury found Jackman guilty of first degree robbery of the Jones Pharmacy on June 22, theft from Jack Richmond on June 29, second degree robbery of Jones Pharmacy on July 6, and intimidating a witness. In a separate proceeding the persistent felony offender charge was considered to which Jackman offered no defense. The jury found him guilty of being a persistent felony offender and the sentences imposed on the robbery, theft, and intimidating a witness charges were accordingly enhanced.
 
 
 8
 Subsequent to conviction the Kentucky Supreme Court, in an unpublished opinion, affirmed Jackman's convictions. In the state appeal Jackman raised the same five issues that he presents in this appeal. The Kentucky Supreme Court dealt specifically with the issue of refusal to sever offenses and the sufficiency of the evidence to find Jackman guilty of second degree robbery. The remaining three issues were held to be without merit and requiring no discussion by the court.
 
 
 9
 Jackman subsequently exhausted his Kentucky post-trial relief procedures and, on April 15, 1983, filed for a writ of habeas corpus in the United States District Court for the Eastern District of Kentucky. The petition was referred to a magistrate who submitted a report and recommendation to the trial judge. Upon a de novo review of the record, the district court adopted the magistrate's recommendation.
 
 II.
 Failure to Sever Counts
 
 10
 Under Kentucky law, the decision of a trial court not to sever multiple offenses charged will be reversed only if the denial of severance amounts to "a clear abuse of discretion and prejudice to the defendant is positively shown." Harris v. Commonwealth, 556 S.W.2d 669 (Ky. 1977). In order to show that prejudice has resulted, a defendant must show something more than the likelihood that a separate trial may offer a better chance of acquittal or a less severe penalty. Russell v. Commonwealth, 482 S.W.2d 584, 588 (Ky. 1972).
 
 
 11
 Although the Kentucky standard of review of severance decisions which closely parallels the federal standard has relevance to the determination of this issue, it is not the controlling factor. The question at this juncture is not whether Kentucky law was followed or ignored, but whether the failure to sever amounted to a constitutional due process violation.
 
 
 12
 It should be pointed out that the issue before this court, of course, is not whether the failure to sever these counts for trial was a violation of a rule of procedure (state or federal); rather the issue is whether the failure to sever denied to Corbett due process of law under the Fourteenth Amendment.
 
 
 13
 Corbett v. Bordenkircher, 615 F.2d 722, 724 (6th Cir. 1980).
 
 
 14
 On appeal petitioner has not framed his argument in due process terms but rather has said that the failure to sever caused him prejudice. This argument completely overlooks the fact that in a habeas proceeding the claimed prejudice would have to be sufficiently great to amount to a due process violation in order to be reviewable by this court.
 
 
 15
 Petitioner's argument as to severance essentially relates to the inclusion in the trial of the Jack Richmond robbery count with the counts relating to the pharmacy robberies. Petitioner essentially concedes that the two pharmacy robberies as well as the alleged intimidation of a witness at one of those robberies are sufficiently connected to have been appropriately tried in one proceeding.
 
 
 16
 As to the Jack Richmond robbery, we conclude that although the better practice might have been to sever this count from the two pharmacy robberies, the failure to do so did not amount to the type of substantial prejudice which would result in a due process violation. The prosecutor, in his closing arguments, urged the jury to consider each offense and its related evidence separately. The jury verdicts would tend to indicate that they independently assessed the evidence as to each crime charged.
 
 
 17
 More importantly, however, in connection with the Richmond incident, the petitioner took the stand and admitted that he took Richmond's ring but offered a different version as to the circumstances under which the ring was taken. The circumstances surrounding this incident were sufficiently unique that it would be difficult to argue that any of the evidence presented relative to the Jones Pharmacy incidents made the jury feel it was more likely that petitioner forcefully took Richmond's ring. Similarly, the jury's conclusion that the petitioner did commit a theft of the ring would not have logically made it more likely that he committed the pharmacy robberies. This was not a situation where similar acts evidence was being offered to buttress the government's case relative to the pharmacy robberies.
 
 
 18
 Lastly, it must be remembered that the evidence against the petitioner on the pharmacy robberies was overwhelming. Without any attempt to disguise his appearance he remained in the presence of his victims in the first pharmacy robbery for 45 minutes to one hour. Similarly, in the second pharmacy robbery, he was with at least some of these same victims for a period of ten to twenty minutes. Their identifications were positive and, once those identifications were made, there was no question as to the robbery itself having been committed. Similarly, as to the Richmond robbery, the petitioner did not offer alibi testimony as he did with the pharmacy robberies but, rather, offered a different version of what occurred which the jury was free to believe or reject.
 
 
 19
 Jackman has had this question reviewed by the Kentucky court system both on direct appeal and through the process of post-conviction relief. He has essentially put before us the same contentions which were rejected by the Kentucky courts. As was stated in Wilson v. McMacken, 786 F.2d 216, 221 (6th Cir. 1986): "In a federal habeas corpus proceeding such as this one, we do not sit as a "'super" state supreme court' to judge whether the judge erred under state law. Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983)."
 
 III.
 
 20
 The Denial of the Directed Verdict Motion on the Second Degree Robbery charge
 
 
 21
 Petitioner's argument on this issue can be simply stated. His contention is that because no weapons were in evidence on the occasion of the second robbery of the Jones Pharmacy he did not meet the definition of robbery in the second degree as set forth in the Kentucky statute. Ky. Rev. Stat. Sec. 515.030 reads in pertinent part as follows:
 
 
 22
 A person is guilty of robbery in the second degree when in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft.
 
 
 23
 Petitioner argues that since no weapons were in evidence at the second robbery he did not use or threaten the immediate use of physical force upon another. Thus, petitioner argues, the evidence was insufficient to find that there had been the necessary degree of intimidation to qualify as robbery in the second degree. The standard by which we review the sufficiency of evidence is as set forth by the Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979), where the court stated:
 
 
 24
 [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt.
 
 
 25
 Id. at 319.
 
 
 26
 At the time of the second robbery of the Jones Pharmacy, two of the employees present had been the victims of the first robbery at which a gun and a knife were involved. Throughout the first robbery the petitioner kept saying: "Just be cool, don't worry, we're not gonna hurt you as long as you do what you're told and just be cool." During the second robbery, while forcing the employees to empty two cash registers, a safe containing drugs, and a Timex watch case, petitioner repeated several times, "Don't worry, we're not going to hurt you. We didn't hurt you last time." It is understandable that the employees, having been previously threatened by weapons, would understand that their continued well being was dependent upon their cooperating in the same manner as they had done before. Both of the employees testified that they were afraid of physical harm if they did not cooperate. Under such circumstances, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. We find no error in the court's denying petitioner's motion for directed verdict on the second degree robbery count.
 
 IV.
 
 27
 The Denial of the Directed Verdict Motion on the Charge of Intimidating a Witness
 
 
 28
 Jackman also contends that there was insufficient evidence to support his conviction for the crime of intimidating a witness. The relevant Kentucky statute reads in pertinent part as follows:
 
 
 29
 (1) A person is guilty of intimidating a witness when, by use of a threat directed to a witness or a person he believes may be called as a witness in any official proceeding, he:
 
 
 30
 (a) Influences, or attempts to influence, the testimony of that person;
 
 
 31
 Ky. Rev. Stat. Sec. 524.040(1)(a).
 
 
 32
 Just prior to Jackman's departure after the second robbery, his comments to the two employees who were present during the first robbery were described as follows:
 
 
 33
 [Ms. Miller]: But at one point whenever he said, "Don't worry, we're not going to hurt you," he turned and looked at me and he said, "Unless you identify us, and then you will get hurt."
 
 
 34
 [Brad Lovell]: They--then they turned around, they were getting ready to leave and one of them told us that if we--that, you know, that if we could identify them, not to, but that there might, you know, be some type of harm done to us. He said that there would be trouble.
 
 
 35
 (App. at 127, 146.)
 
 
 36
 There is little doubt that Jackman threatened the employees and that they felt intimidated by such threats. It is Jackman's claim, however, that the crime of intimidating a witness cannot be committed if the intimidation occurs during the commission of the substantive offense. Although there is no Kentucky decision squarely on point on this issue, there is a recent Kentucky case that, by analogy, would appear to provide an appropriate answer to petitioner's contention. In Penn v. Commonwealth, 687 S.W.2d 135 (Ky. 1985), the defendant was charged with bribing a witness. It was alleged that the defendant had offered money to a person in return for that person not reporting to the authorities the fact that he had seen a marijuana patch growing on the defendant's land. Ky. Rev. Stat. Sec. 524.020 states:
 
 
 37
 (1) A person is guilty of bribing a witness when he offers, confers or agrees to confer any pecuniary benefit upon a witnesss or a person he believes may be called as a witness in any official proceeding ----
 
 
 38
 The defendant was convicted of the offense of bribery and argued on appeal that the statutory language did not cover what he had done. The Kentucky Supreme Court, in discussing the question of who is a "witness" for purpose of the bribery statute, stated:
 
 
 39
 The question is not whether the person offered the bribe has technically been classified as a "witness" in a pending proceeding so much as it is whether the person offered the bribe . . . may be called as a witness in any official proceeding . . . . The current statute's specific use of the word "may" in and of itself removes the absolute requirement previously imposed by Bailey, that the accused should know that the person to whom the bribe was offered was in fact a witness. The jury must only be convinced that the accused had an intent to influence the testimony of a potential witness.
 
 
 40
 687 S.W.2d at 137.
 
 
 41
 We believe Penn to be an analogue for the situation presented here, and conclude that petitioner's attempt to intimidate a potential witness, although occurring during the commission of the substantive offense, would be covered by the applicable Kentucky statute.[2]
 
 V.
 The Pre-Arraignment Lineup
 
 42
 Petitioner was initially arrested at 11:00 p.m. on Friday, July 6, after his car had been identified as the one involved in the robbery earlier that day. At the time of his arrest, it was petitioner's claim that someone had borrowed his car on July 6 and that his brother had been mistaken for him in the past by police officers. The police continued their investigation at this point. The petitioner was not clearly implicated in the first pharmacy robbery until after being identified by the witness during a lineup which was conducted on Sunday evening, July 8. Petitioner had no attorney at this point in time, and so the lineup was conducted without counsel being present.
 
 
 43
 The trial court at the suppression hearing determined that the earliest opportunity for petitioner's arraignment was Monday morning, July 9, and found no evidence to suggest that the arraignment had been delayed in order to conduct a lineup prior to the appointment of counsel. These represent factual findings which we must presume to be correct pursuant to the dictates of 28 U.S.C. Sec. 2254(d).
 
 
 44
 The United States Supreme Court has dealt specifically with the issue of counsel-less prearraignment lineups in Kirby v. Illinois, 406 U.S. 682 (1972). In Kirby, the Court stated:
 
 
 45
 In a line of constitutional cases in this Court stemming back to the Court's landmark opinion in Powell v. Alabama, 287 U.S. 45 [1932], it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.
 
 
 46
 This is not to say that a defendant in a criminal case has a constitutional right to counsel only at the trial itself. The Powell case makes clear that the right attaches at the time of arraignment, and the Court has recently held that it exists also at the time of a preliminary hearing. But the point is that, while members of the Court have differed as to existence of the right to counsel in the contexts of some of the above cases, all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.
 
 
 47
 Kirby, 406 U.S. at 688-689 (citations and footnote omitted).
 
 
 48
 Petitioner concedes that the lineup in question here was conducted prior to arraignment, but argues that it was after the institution of "formal charges." The record made at the suppression hearing supports petitioner's contention, at least in part.
 
 
 49
 Q. Did you participate in the actual arrest?
 
 
 50
 A. I did.
 
 
 51
 Q. Had formal charges been placed against him (Jackman) at that time?
 
 
 52
 A. They had.
 
 
 53
 Q. Okay, when were they placed?
 
 
 54
 A. At the time of arrest on the robbery of July 6; charged with robbery, first degree and threatening a witness.
 
 
 55
 (App. at 56-57.)
 
 
 56
 Based upon the transcript we must conclude that formal charges had been placed against the defendant as to the second robbery but not as to the robbery of Richmond or the earlier pharmacy robbery. We do not decide this issue, however, on the fact that there were formal charges placed against the petitioner with regard to some of his crimes but not as to others. Maine v. Moulton, 106 S.Ct. 477, 490 n.16 (1985). It appears that a more principled basis for deciding this issue would be that although there may have been a violation of his right to counsel in connection with the lineup, the in-court identification of the defendant was in no way tainted by the lineup. The witnesses who identified Jackman in court had had a total of appoximately one hour to observe him on two different occasions. Jackman was not wearing any type of disguise at the time of the two pharmacy robberies. Under such circumstances, we conclude that the in-court identifications of Jackman were sufficient to support his conviction for the offenses charged.
 
 
 57
 The question we must answer under these circumstances is not whether counsel was present or not when the lineup was conducted, but whether the absence of counsel somehow resulted in a miscarriage of justice growing out of a tainted in-court identification procedure. In addition to the lengthy time that the witnesses had to identify the petitioner during the actual commission of the robbery, the reliability of their in-court identification was also buttressed by the fact that when shown a photo array after the first robbery which did not contain a picture of petitioner - they made no identification. Although recognizing that harmless error in the context of an asserted constitutional violation is an extremely narrow standard, we nonetheless conclude under these circumstances that any error that may have occurred as a result of the jury learning of a lineup identification was harmless beyond a reasonable doubt. Melchior v. Jago, 723 F.2d 486, 493 (6th Cir. 1983).
 
 
 58
 A case factually similar to this one in which the same conclusion was reached is United States ex rel. Burton v. Cuyler, 439 F. Supp. 1173 (E.D. Pa. 1977), aff'd, 582 F.2d 1278 (3rd Cir. 1978). In Burton, although the court concluded that the Pennsylvania state court had been in error in admitting testimony relative to lineup identifications which occurred without counsel, it concluded that the in-court identifications which had a factual basis similar to the one in this case were sufficiently reliable and had an independent basis for identification so that any error was rendered harmless.[3]
 
 
 59
 We further note that although petitioner argues that counsel was not present at the lineup, he does not otherwise attack the fairness of the lineup procedures.
 
 VI.
 The Persistent Felony Offender Conviction
 
 60
 On this issue also Jackman's contentions can be stated quite simply. The applicable Kentucky statute, Ky. Rev. Stat. Sec. 532.080(3), provides that an individual is subject to conviction as a Persistent Felony Offender (PFO) only if he is more than 21 years old and has two or more previous felony convictions. It is also necessary for the prosecution to demonstrate that the defendant was over the age of 18 years at the time of the commission of the predicate felony offenses. Ky. Rev. Stat. Sec. 532.080(c)(b).
 
 
 61
 It is the petitioner's contention that at his trial the prosecution failed to introduce any competent evidence as to the petitioner's age at the time of trial or at the time of the commission of any of his prior felony offenses. Petitioner's contention is primarily predicated on the fact that this was a bifurcated trial in which the robbery and witness intimidation charges were first heard, and then the same jury later heard the evidence on the PFO count. There is no doubt from an examination of the record that the jury, during the course of the entire bifurcated proceedings, had the evidence before it necessary to conclude that at the time of trial defendant was 21 years of age or older and that at the time he committed his prior felony offenses he was of the age of 18 years. At the trial petitioner himself testified that he was born on September 20, 1943. Detective William Read also testified that at the time of petitioner's arrest, petitioner told him that his date of birth was September 20, 1943. Since the trial was conducted in December of 1979, it was clear that the jury could conclude by simple arithmetic that the petitioner was 21 years of age or older at the time of trial.
 
 
 62
 During the PFO phase of the trial, the government, through a deputy court clerk, introduced the court records relating to each of the petitioner's three previous felony convictions. From these records the deputy court clerk testified that petitioner's first felony conviction resulted from an offense committed on September 30, 1963. His second and third felony convictions were for offenses committed April 15, 1968 and May 19, 1973. Again, simple arithmetic would indicate that at the time of petitioner's prior felony convictions he was, respectively, 20, 24, and 29 years of age. The record thus clearly demonstrates the necessary age predicate for the PFO conviction.
 
 
 63
 The fact that part of the age testimony came out in the first part of the bifurcated trial and part of it came out in the second part of the bifurcated trial is not sufficient grounds to entitle petitioner to any type of relief. Even if such a procedure for presenting age testimony were violative of Kentucky procedures, it would not constitute an error of constitutional dimension that would be an adequate basis for habeas relief. The jury had in totality the information that was necessary to make the conclusions required as to petitioner's age. Certainly no miscarriage of justice was occasioned by the fact that this information came to it in separate portions of a bifurcated trial.
 
 
 64
 Not only is federal habeas corpus law against the petitioner on this point but, additionally, he cannot prevail even under the law of the State of Kentucky. Brown v. Commonwealth, Ky., 551 S.W.2d 557 (1977), clearly holds that evidence obtained in the first part of a bifurcated trial can be used against the defendant in the second part of the bifurcated trial dealing specifically with the PFO offense.
 
 
 65
 Finding as we do that there is no merit to this last claimed error, we need not address the issue of whether this matter is properly before the court due to it not being raised in the district court.
 
 
 66
 AFFIRMED.
 
 
 
 [1]
 Petitioner's fifth claim as to his age at the time of previous felony convictions was not raised in the district court. Since it was an exhausted state claim, however, we consider it on appeal
 
 
 [2]
 We again note that as to both of petitioner's arguments on insufficiency of the evidence, he does not frame these issues in terms of constitutional deprivations
 
 
 [3]
 It is not at all clear from the record that the right to counsel had come into being here. The arresting officer testified that "formal charges" had been placed against Jackman, but there is no explanation as to what these charges were. The officer may well have been referencing only the arrest warrant. As was stated in the post Kirby decision of United States v. Gouveia, 467 U.S. 180, 189 (1984):
 Thus, given the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings "is far from a mere formalism." Kirby v. Illinois, 406 U.S. at 689. It is only at that time "that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." Ibid.
 (Emphasis added.) Furthermore, we have specifically held in United States v. Reynolds, 762 F.id 489, 493 (6th Cir. 1985), that an arrest warrant is not the type of adversary judicial proceeding which will trigger the right to counsel.